**SAMINI BARIC KATZ LLP**
Bobby Samini, Esq. (SBN 181796)
Michael Katz, Esq. (SBN 181728)
Steve Baric, Esq. (SBN 200066)
Nicole C. Prado, Esq. (SBN 269833)
John S. Oney IV, Esq. (SBN 338596)
650 Town Center Drive, Suite 1500
Costa Mesa, CA 92626
Telephone: (949) 724-0900
Facsimile: (949) 724-0901
Email: bobby.samini@sbklawyers.com
Email: michael.katz@sbklawyers.com
Email: steve.baric@sbklawyers.com
Email: nicole.prado@sbklawyers.com
Email: john.oney@sbklawyers.com

*Attorneys for Plaintiffs,*
*Anthony M. Stowers and Erin Tomlinson*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY M. STOWERS, an individual; and ERIN TOMLINSON, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>INTERNATIONAL CHURCHES OF CHRIST, INC., a California nonprofit corporation; THE INTERNATIONAL CHRISTIAN CHURCH, INC., a California nonprofit corporation; HOPE WORLDWIDE, LTD., a Delaware nonprofit corporation; MERCYWORLDWIDE, a California nonprofit corporation; CITY OF ANGELS INTERNATIONAL CHRISTIAN CHURCH, a California | Case No. 2:22-cv-09472-ODW-PLA<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. **SEXUAL ASSAULT OF A MINOR**<br>2. **VIOLATION OF PENAL CODE 647.6(A)(1)**<br>3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>4. **NEGLIGENT HIRING, SUPERVISION, AND RETENTION**<br>5. **NEGLIGENT SUPERVISION OF A MINOR**<br>6. **FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP.** |

nonprofit corporation; THOMAS ("KIP") McKEAN, an individual; THE ESTATE OF CHARLES "CHUCK" LUCAS; CROSSWAY CHURCH, CORNERSTONE CHURCH OF CHIRST; THE CHICAGO CHURCH OF CHRIST and DOES 1 through 100, inclusive,

                    Defendants.

**BASED ON VICARIOUS LIABILITY**
7.   **NEGLIGENCE**
8.   **VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ("RICO") ACT 18 U.S.C. § 1962(C)**
9.   **SEXUAL BATTERY IN VIOLATION OF CAL. CIV. CODE § 1708.5**
10.  **GENDER VIOLENCE IN VIOLATION OF CAL. CIV. CODE § 52.4**

**JURY TRIAL DEMANDED**

Plaintiffs ANTHONY M. STOWERS and ERIN TOMLINSON (collectively, "Plaintiffs") hereby submit this Complaint pursuant 18 U.S.C. §§ 1961 *et. seq.*, the California Civil Code and the California Penal Code, under federal question and supplemental jurisdiction against Defendants INTERNATIONAL CHURCHES OF CHRIST, INC., THE INTERNATIONAL CHRISTIAN CHURCH, INC., HOPE WORLDWIDE, LTD., MERCYWORLDWIDE, CITY OF ANGELS INTERNATIONAL CHRISTIAN CHURCH, THOMAS "KIP" McKEAN, THE ESTATE OF CHARLES "CHUCK" LUCAS, CROSSWAY CHURCH, CORNERSTONE CHURCH OF CHRIST, THE CHICAGO CHURCH OF CHIRST and all other named and unnamed defendants (collectively, "Defendants") and states as follows:

## **INTRODUCTION**

1.      This action to recover damages on behalf of adult victims of childhood sexual assault is governed by Code of Civil Procedure section 340.01 ("section 340.01").

2.      The incidents of childhood sexual assault against Plaintiffs alleged herein were facilitated and actively concealed by Defendants while Plaintiffs were minors.

3.      This case involves an **inhumane abuse enterprise of epic proportions** that has been perpetrated and actively concealed by a **ruthless den of sexual predators** wherein, through systemic physical force and psychological manipulation, **women and children as young as 3 years old were repeatedly raped and sexually abused with impunity by trusted church members**.

## **JURISDICTION AND VENUE**

4.      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et. seq.*).

5.      Pursuant to Code of Civil Procedure §340.1(q) as amended by Assembly Bill 218, effective January 1, 2020, there is a three (3) year window in which all civil

claims of childhood sexual assault are revived if they have not been litigated to finality. This provision provides that, "[n]otwithstanding any other provision of law, any claim for damages described in paragraphs (1) through (3), inclusive, of subdivision (a) that has not been litigated to finality and that would otherwise be barred as of January 1, 2020, because the applicable statute of limitations, claim presentation deadline, or any other time limit had expired, is revived, and these claims may be commenced within three years of January 1, 2020. A plaintiff shall have the later of the three-year time period under this subdivision or the time period under subdivision (a) as amended by the act that added this subdivision." This claim has not been previously litigated to finality; thus, it is timely under the revised provisions of Code of Civil Procedure §340.l(q).

6.      This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and, therefore, they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Additionally, the "nerve centers" of the International Churches of Christ, Inc., and The International Christian Church, Inc. are both within the jurisdictional boundaries of the Central District of California.

## THE PARTIES

### A. PLAINTIFFS

8.      Plaintiff Anthony M. Stowers ("Plaintiff Andy" or "Andy") is a citizen and resident of New York. Andy was a minor, citizen of the United States of America, and resident of the State of California at the time that he first became a victim and survivor of Defendants' sexual abuse and trafficking.

9.      Plaintiff Erin Tomlinson ("Plaintiff Erin" or "Erin") is a citizen and

resident of Illinois. Erin was a minor, citizen of the United States of America, and resident of the State of California at the time that Erin first became a victim and survivor of Defendants' sexual abuse and trafficking.

**B. DEFENDANTS**

10. Defendant International Churches of Christ, Inc. (the "ICOC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. The ICOC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. The ICOC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide. This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

11. Defendant The International Christian Church, Inc. ("ICC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. ICC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. ICC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide. This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

12. Defendant HOPE worldwide ("HOPE") was founded in 1994 by the ICOC and is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business registered with the Secretary of State for the State of California located at 9449 Balboa Ave. Ste. 311, San Diego, California 92117. HOPE purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California.

13.     Defendant MERCYWorldwide ("MERCY") was founded in 2009 by the ICC as a domestic nonprofit corporation and registered with the California Secretary of State as a California corporation. Both the ICC and MERCY listed its principal address at the same address: 2305 30th Street, Santa Monica, California. MERCY purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. MERCY is partially owned by ICC and the principal source of funding for all administrative costs is the ICC.

14.     Defendant City of Angels - International Christian Church ("City of Angels") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. City of Angels purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. City of Angels has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

15.     Defendant Thomas "Kip" McKean ("Kip" or "McKean"), upon information and belief, is a United States citizen, currently residing in Pacific Palisades, California. At all times relevant to the events that form the basis of this Complaint, Defendant Kip was a member of ICOC's Los Angeles regional branch, and later, the City of Angels International Church of Christ in Los Angeles, California. Defendant Kip resided in California for extended periods while conducting business in California on behalf of Defendant ICOC and Defendant ICC.   Defendant Kip's supervision, direction, and control over the Defendants forms the basis of his personal liability.

16.     Defendant The Estate of Charles "Chuck" Lucas ("Chuck" or "Lucas"), upon information and belief, was a citizen of the United States of America and was residing, at the time of his death, in Thomasville, Georgia. At all times relevant to the

events that form the basis of this Complaint, Defendant Chuck was a member of the ICOC, and later, formed another church called Cornerstone. Defendant Chuck resided in Georgia for extended periods while conducting business in California on behalf of Defendant ICOC.   Defendant Chuck's supervision, direction, and control over the Defendants forms the basis of his personal liability.

17.   Defendant Crossway Church ("Crossway" or "Crossway Church") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Florida. Crossway purposefully conducts substantial religious and affiliated programs and activities in the State of Florida. Crossway has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

18.   Defendant Cornerstone Church of Christ ("Cornerstone" or "Cornerstone Church") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Georgia. Crossway purposefully conducts substantial religious and affiliated programs and activities in the State of Georgia. Cornerstone has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

19.   Defendant The Chicago Church of Christ (the "Chicago Church") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Illinois. Crossway purposefully conducts substantial religious and affiliated programs and activities in the State of Illinois. The Chicago Church has ecclesiastical, governmental, and administrative authority over the business and

conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

20.     Plaintiffs are ignorant of the true names of the defendants sued herein as Does 1-100, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend the Complaint to allege their true names when ascertained. Plaintiffs allege that, at all relevant times herein, Does 1-100 were the co-conspirators, subsidiaries, employees, employers, and agents of constituent members of Defendants herein. Plaintiffs allege that each of the fictitiously named defendants is legally responsible for the actions forming the basis of this Complaint and that Plaintiffs' losses and damages are the result of their wrongful conduct.

## GENERAL ALLEGATIONS
## INTRODUCTION TO DEFENDANTS' METICULOUSLY CRAFTED, HEINOUS ABUSE ENTERPRISE

21.     Defendants, at the direction and control of McKean and Lucas, have collectively exploited everything good and noble in their trusting and loyal members by callously robbing them of their childhood innocence through **psychological coercion and manipulation; pervasive sexual abuse of children as young as 3 years old; and shameful financial abuse**. Each of the foregoing abuses were actively concealed by Defendants to avert discovery by child protective services and the police.

22.     Founded in 1993, ICOC has become an intricate and intentionally confusing "network of over 700 non-denominational churches in about 150 countries." Throughout its history, ICOC has gone by other names, such as: the Boston Movement, the Discipling Movement, the Crossroads Movement, and Multiplying Ministries, for example. Often, the city in which a local assembly is located is added to the name, for example, Milwaukee Church of Christ and Sarajevo Church of Christ."

/ / /

23.    To ensure Defendants' exploitative conduct remains unchecked, Defendants have utilized their vast resources to **silence any internal dissidents through threats, back room dealings and defamation**, and if necessary, vexatious litigation.

24.    Defendants have created a "David and Goliath" scenario, where the few members that have spoken up over the last four decades, have been swiftly suppressed. Defendants have intentionally created a system of exploitation that extracts any and all value it can from members and non-members while shielding their illicit conduct from discovery by outsiders.

25.    Defendants coerced parents/members to remain silent regarding the abuses their children suffered through payoffs and non-disclosure agreements. It is the vast financial base that has insulated Defendants from exposure, and provides legitimacy and license to Defendants' shameful system of exploitation and abuse. The **communal ostracization and isolation from the outside world has caused highly debilitating emotional and mental harm, and in some cases, suicide**.

26.    Defendants operate with a strict and documented **discipleship pyramid**, where every member has an elder disciple member "over them" that acts as a mentor and jailor. This carefully crafted infrastructure enables both churches to execute and maintain a **micromanaged degree of control over every aspect of each member's life**. Members are systematically deindividualized, only to endure communal isolation from the world at large.

27.    Only "disciplers" were allowed to provide any counseling to church members, however, they were not licensed counselors or mental health practitioners. Abuses were reported to the "disciplers", however, no investigations were initiated and no reports were made to the police by Defendants, and each of them.

28.    Defendants created a religious requirement that mandated victims to confess "sins" on a daily basis, however, "disciplers" would share the specifics of these "sins" with other groups and leaders in a juvenile gossip-like culture that permeated

the church. This allowed Defendants to use Plaintiffs' abuses as emotional blackmail within the community.

29.     In addition to the "discipler" structure, Defendants were/are characterized by **indoctrination of rigid fundamentalist teachings, unyielding compliance with instruction and strict social separatism**. Every new member undergoes a rigid conversion process that is tantamount to **systemic brainwashing**, called the "First Principles" and once a new member agrees to all indoctrination related teachings, they must be baptized in water and completely devote their life to the church.

30.     Defendants taught their members that only fellow church members are "true disciples" of Jesus who will be rewarded with a place in heaven in the afterlife; non-members will not go to heaven and are not "true disciples" of Jesus. Indeed, this **insider-outsider dichotomy** allowed scores of sexual predators within the churches to abuse children without fear of criminal prosecution. Defendants created a **highly exclusive environment for its members** wherein they were/are prohibited from marrying anyone outside the church and the church must approve all marriages, which ultimately gives the church an incredible degree of control over every aspect of members' lives.

31.     Moreover, Defendants indoctrinated their parishioners to forgive any slight, no matter how severe, and "move on" without reporting such abuses. Defendants teach/taught that because "no one is free from sin," judging the conduct of another, no matter how villainous, is beyond the right of any individual. Further, **parishioners must protect God's church and modern-day movement from all challenges**.

## THE CHURCHES' EARLY ORGANIZATIONAL STRUCTURES CREATED AN IMMOVABLE FOUNDATION THAT FACILITATED THE SYSTEMIC PHYSICAL AND SEXUAL ABUSE OF CHILDREN

32.     Founded in Boston in 1979 under the "Boston Movement" moniker by Thomas "Kip" McKean ("Thomas McKean", "Kip" or "McKean") (and 29 other members) through secession from the Church of Christ in Gainesville, Florida. The

fledgling "church" quickly sought new members upon formation and enjoyed considerable expansion and success. After the Boston Movement obtained religious and corporate recognition as the International Church of Christ in the 1980's, **ICOC swiftly grew into a multinational movement**. According to the ICOC's self-reported statistics, the ICOC is a body of approximately 700 cooperating Christian non-denominational congregations spread across 144 nations, with more than 120,000 members worldwide.

33.     Although ICOC contends that each ICOC church location is unrelated to the others, they present a unified front and hold themselves out to the general public as a fiercely loyal consolidated unit. However, when any church comes under scrutiny for any reason, the churches conveniently distance themselves from the scrutinized church. Regardless of the churches' feigned individuality, their websites clearly delineate the interconnectedness of all ICOC locations, specifically in connection with their general structure, belief system, Chairs, overseers and delegates of each department.

34.     In 1979, the Church of Christ that helped spawn ICOC and eventually ICC, was jointly led by Charles Howard Lucas ("Chuck" or "Chuck Lucas"), a licensed psychologist at the time, and McKean. It is commonly understood that **McKean, was acutely aware of, the physical, psychological, and sexual abuses Lucas and other church members wrought upon children and adult parishioners**.

35.     Academic writings, journals, recovered correspondence, newspaper articles, eyewitness accounts, and publications like the book, "Toxic Christianity," which was written by former ICOC leading members under the pseudonym "Mr. X".[1] These are but a fraction of the litany of information depicting the practices and abuses Defendants institutionalized to the point of normalcy within the church.[2]

---

[1] Toxic Christianity. It's widely believed that Rick Bauer co-published with another church leader under the pseudonym "Mr. X" and can be accessed in its entirety here: http://www.reveal.org/library/theology/Toxic.pdf

[2] Writings from former members and ICOC leaders, in addition to information about the ICOC/ICC churches organizational structure, religious dogma, and their associated analyses can be found at http://www.reveal.org/library/psych/stumpk.html

36.     ICOC was incorporated in California in December 1994. Its Articles of Incorporation filed with the California Secretary of State stated that upon dissolution, "the remaining assets of this Corporation shall be distributed to…the individual congregations that are part of the worldwide fellowship of churches of Christ (which are affiliated with the Corporation), if they qualify as distributees under the provisions of this Section."

37.     The International Christian Church (ICC) was founded by Kip McKean in 2006 after he was forced out of ICOC. ICC was registered in California as a nonprofit religious corporation in October 2006, and as of December 2022, ICC listed 104 affiliate churches on its website. Articles of Incorporation filed by ICC with the California Secretary of State included references to affiliates of ICC. One part stated that upon dissolution of ICC, "the assets of this Corporation shall be distributed to other nonprofit funds, foundations or corporations affiliated with the International Christian Church.[34]

38.     Defendants are independently operating a **highly profitable pyramid scheme supported by a web of paper corporations and sham 501(c)(3) entities**, culminating in **hundreds of millions of dollars in illicit gains**. The full extent of ICOC and ICC's profiteering is unknown, especially given the tithing and labor contributions ICOC and ICC routinely coerce from their members.

---

[3] Between April 2020 and February 2021, 18 branches of the ICC received Paycheck Protection Program (PPP) loans. These loans totaled $287,490, and a total of $290,040 was forgiven, including accrued interest.

[4] Churches associated with the ICOC appeared to be incorporated into separate entities, according to a review of public records. For instance, the Los Angeles International Church (LAICC), the largest ICOC church by membership, was incorporated in California in December 1990, according to corporate records with the California Secretary of State. The Los Angeles International Church (LAICC) described its structure on its website, noting that it's "organized into eight self-supported regions. Each regional evangelist has been given the charge of equipping the brothers and sisters in his part of the LA church (region) to effectively evangelize his area with the saving message of Jesus Christ as well as helping one another mature in Christ." Notably, "each region has a regional financial advisory group that assists the ministry staff and the Board of Directors with the oversight of the finances in their particular region."

39.     ICOC and ICC also benefitted from millions in governmental support through forgivable PPP loans[5] and ICC benefitted from millions in members' personal SBA loans, authorized under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).  Through their veiled abuse of the corporate form and systematic financial exploitation of their members, Defendants have created a cash cow built upon complex layers of deceit and manipulation of their vulnerable members.

40.     One example of a tax-exempt corporation under the ICOC/ICC corporate umbrella is the sham charity organization Defendant HOPE, which has generated over $100 million in tax-free revenue over the last six years. On information and belief, **HOPE and ICOC often commingled these funds and made arbitrary decisions regarding where "donation" money meant for HOPE would eventually be disbursed**.

41.     Chuck Lucas led the CrossRoads Church of Christ in Gainesville, Florida, before he was paid off to leave Florida and start another church in approximately 1986, with the explicit goal that **Chuck would no longer be associated with the ICOC because of his deviant behavior**. ICOC and McKean strategically downplayed Chuck's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough, these "recurring sins" were never investigated by ICOC.[6] Defendants, McKean and other church leaders were acutely aware of Chuck's disturbing pattern of abuse, but nevertheless actively concealed Chuck's misdeeds to avert discovery by the police.

42.     Chuck died in August 2018, however, Plaintiffs and scores of members witnessed his ongoing abuse of children and adults within the congregation through the end of his despicable life.

---

[5] During the COVID-19 pandemic, branches of ICOC received 77 Paycheck Protection Program (PPP) loans, totaling over $9.4 million. **Over $9.2 million of those loans were forgiven**, including accrued interest. (projects.propublica.org, accessed December 15, 2022; disciplestoday.org, accessed December 15, 2022)

[6] History Repeats Itself: The Rise and Fall of Kip McKean & Chuck Lucas.  Ryan Britt. 2002. Accessed on December 29, 2022 at http://www.reveal.org/library/history/britt2.html

43.     Sam Laing, one of Chuck's continued faithful supporters and a prominent lead evangelist with ICOC, was aware of Chuck's deeply disturbing abuses and its chronology. Sam Laing recently made a statement about Chuck in a 2018 article published in "Disciples Today," which is an ICOC owned platform/news source:

> **"Chuck Lucas was a man of deep conviction. He was a disciple of great courage and perseverance. He was criticized, persecuted and attacked for what he stood for, but he never quit. Yes, he had his weaknesses and failures along the way, but he, by grace, repented and overcame them, and was restored."[7]**

## McKEAN FORMED ICC, A CARBON COPY OF ICOC, TO CONTINUE THE SAVAGE ABUSE ENTERPRISE

44.     In or about 2003, McKean formally split from ICOC after an uprising and various op ed public letters were published by ICOC leaders. He officially formed ICC in or about 2006. ICC encompassed the same guiding principles and culture as ICOC. **ICC was a carbon copy of ICOC, however, ICC eventually eclipsed ICOC in terms of the mania, secrecy and abuse that occurred within its churches**.

45.     From its inception, ICC improved upon ICOC's tools of mass manipulation and exploitation, which aligned with McKean's vow to learn from any past incidents of dissent or divisiveness and ensure that challenges to his authority never occurred in his new "movement of God".

46.     McKean currently oversees all ICC operations from its Los Angeles headquarters and he has completely separated himself from ICOC because he believes the entire ICOC congregation is lost, likely because he is no longer the leader. ICC's current membership is believed to include approximately 7,000 individuals.

---

[7] Chuck Lucas: A Servant of God. Sam Laing. 2018. Accessed on December 29, 2022.
https://www.dtodayarchive2.org/chuck-lucas-gods-servant-and-how-he-used-him

47.     A former leader of ICC, Coltin Rohn, oversaw the Columbus, Ohio ICC congregation and was **fired for publicly voicing concerns surrounding McKean and other ICC leaders' financial abuse, coercion, and control**. Coltin was a full-time evangelist with ICC but was immediately fired for criticizing the church's tactic of bullying members to give a specific amount of money to the church. Coltin was deeply concerned about the church's practice of threatening a members' salvation and standing within the community if they did not give 10-40% of their annual income to the church.[8]

48.     On or about December 24, 2022, Coltin became aware of an ICC letter, sent out to every ICC member showing the process of "marking" Coltin and his wife. Defendants have continued to threaten anyone who speaks out against the church with vexatious legal actions, disfellowship, and/or "marking."

### THE "DISCIPLING" STRUCTURE IS THE FOUNDATION OF DEFENDANTS' DEPLORABLE CAMPAIGN OF MANIPULATION, PSYCHOLOGICAL AND SEXUAL ABUSE OF CHILDREN

49.     ICOC was born from a "discipling" movement that arose among the Churches of Christ during the 1970's and the church has maintained this practice in present times. This is a strict practice involving a "discipleship hierarchy" where a formal **discipleship tree or a top-down authoritarian hierarchy** was formed.

50.     Church leadership assigns a specific and strategic discipleship partner to oversee and guide the other member. The "disciplining" movement was memorialized by Flavlil R Yeakley Jr. in a book titled "The Discipling Dilemma". The **rigid and pervasive culture of fear, coercion, control, manipulation, judgment, exclusion, punishment**, along with the church's overt focus on membership growth (i.e., its primary source of income), have resulted in a **widely accepted categorization of ICOC and ICC as toxic, destructive cults**.

---

[8] The New York Daily News stated that "dozens" of former members of ICOC "call it a destructive sect that is more concerned with drawing in new members and draining their money than in matters of faith." **One ex-member of ICOC described ICOC as a "pyramid scheme" in which members "were all giving 10% to 40% of our income."**

51.     Any member's position, health, and wellbeing depend heavily upon success in expanding the congregational rosters. Defendants' leadership created a self-perpetuating business model to attract new recruits/members, and in doing so, generate hundreds of millions of dollars in revenue for the church.

52.     An illustration of the Defendants' hierarchical model of authority is depicted below:

The ICC had a complex and highly hierarchical organizational structure, unusually so for a relatively new and small religious group. There are many layers of leadership, similar to a pyramid or the Roman Catholic Church.



The ICC has a pyramid-shaped, hierarchical structure of authority. At the top was Kip McKean, the *World Missions Evangelist*, and his wife Elena Garcia-McKean, who served as *Women's Ministry Leader* for the group as a whole. As of November of 2002, the Mckeans

53.     In addition to functioning as a life coach to other members, the "discipler" members also acted as de facto therapists. The disciplers would frequently instruct members to conduct themselves in a certain manner and if the member did not heed to the instructions, they were rebuked or labeled as "disobedient" or "arrogant" until they were eventually "broken" by their sins.

/ / /

54.     The discipler structure has facilitated Defendants' systemic concealment of abuse and allowed predators to abuse women and children with impunity. For example, on July 1, 2018, Damon and Vicki James, ICC "disciplers" working at the specific direction of McKean instructed a member to refrain from reporting two years of physical and sexual abuse by her husband. Damon James scolded this survivor and stated, "[w]e don't do that to our brothers as disciples."

55.     Vicki James then victim shamed the woman by stating "[w[]hy would you have the heart to press charges?" Damon continued and told the woman, "[w]hat does that gain? That puts you in front of 'the world'." This situation resulted in the woman eventually defecting from ICC and she is trying her best to recover from the years of abuse she endured by her husband and ICC.

56.     The following is a harrowing statement by Carter Whitten regarding the abuse he endured in connection with his "discipler" experience:

> "For reasons I still don't fully understand, my 'discipler' met with me and two other teen boys at one of the boys' houses. In the basement we sat in a circle, and the goal of my discipler was to break me down and to get me to fully understand the horrors of Hell: Meaning what I had to look forward to if I didn't enter the Kingdom (the ICOC) before I died. So next he took it upon himself to paint a vivid picture for me: My discipler described a scene in hell in which I was nailed to a ceiling by my PENIS and spun around by a demon. Hanging only by my genitals, I was forced to watch the devil RAPE my mother repeatedly for all eternity. I was then asked to take that grotesque vignette and multiply its terror by 10,000 (or some other arbitrarily large number) to catch even a glimpse of how utterly horrifying the future awaiting me was, unless I was to get baptized and be saved. I finally broke down and cried. Which was clearly the goal, as the ICOC famously conducted what they called "breaking sessions."
> In addition to completing their entire conversion series of Bible studies, there were even more hurdles I was told I had to clear in order to become a baptized disciple. One is

that I had to call the fathers of all the girls in the teen ministry to whom I was sexually attracted, confess my sins of lust after their daughters, and ask for the fathers' forgiveness. I was mortified. I then asked another teen boy—a good friend of mine, if he had been made to do the same thing before he got baptized. He revealed he had indeed been told to do so, and was terrified by the whole ordeal and shunned by most of those fathers.

The final step was the sin letter or sin list. All disciples-in-training (those studying the Bible) were expected to write an exhaustive letter to God, documenting every single sin they had ever committed in their entire lives and asking for forgiveness. The letter was usually meant to be read aloud in a group setting. I was only 14.

I must have been twelve or thirteen when I realized that almost every conversation or sermon in the teen ministry was talking about lust and masturbation and sexual sin on some level. So now looking back as an adult, I am horrified by how perverse and abusive this culture was. Like many evangelical denominations, the ICOC indulged in purity culture and thus placed a heavy emphasis on sexual purity.

But the ICOC took it to a whole new level, the way that adults dealt with teens in these ministries—children that were not their children—Seems criminal to me. At the very least, it was a gross and egregious abuse of the power dynamic between adults and children. And I know enough people across the country in the ICOC to know that this was not an isolated incident, it was literally happening in every 'teen ministry.'

But even worse than this, I had a friend that was physically assaulted while he was studying the Bible, because he tried to get up and leave. So the teen leader held him down and beat him up.
We had to meet in one-on-one and group D-times, where we had to confess our sins (especially sexual sins) in a group setting, and the disciplers (teen leaders) would

sometimes confess sins as well. During one such meeting, an adult discipler confessed to a group of four or five boys that he had had a wet dream (nocturnal emission) that week, and in many other meetings we were told by disciplers that masturbation equated to "ejaculating on the cross." I never understood why grown men were spending so much time with boys as young as 12 and 13 confessing all their sexual sins to them… I heard things I had never heard before, and it all felt very abusive and inappropriate to me, even as a child.

Why were grown adults grilling other people's teenagers for specific sexual details… When most of these teens had never even had a sexual experience in their life. The abuse of power here and power dynamics were so damaging to most of these teens in the teen ministry, that the PTSD and anxiety and therapy that most of these children have needed their whole lives is astounding."

## CHURCH LEADERS WERE OBSESSED WITH FINANCIALLY EXPLOITING ITS MEMBERS

57.     McKean, along with other ICOC leaders were obsessed with growing church membership and, therefore, **imposed recruiting quotas on members**. All members were required to attempt to recruit a certain number of new members each day and members were also required to bring visitors to all church events. ICOC imposed quotas for everything imaginable. **Members were isolated from outsiders and the church cultivated an atmosphere that promoted and concealed the systemic abuse of women and children within the church**. Members were together every day, and they were not allowed much, if any, contact with family members or friends who were not church members. Of course, the only exception to this strict rule is that members could contact outsiders for the sole purpose of recruitment.

58.     Defendants' members were forced to tithe and give 10-40% of their gross income to the church *and* participate in special contributions for missions approximately twice a year equaling approximately **40 times their normal tithe amount**. ICOC was relentless in its pursuit for funding and church leadership would

resort to **interrogating members about their income**, going so far as to **demand copies of the members' paystubs**. For example, if a member gave $4,000 per month, the total mission contributions for that year would equal an additional (40x) and the total required sum would be $160,000 in addition to the normal yearly tithe amount of $48,000. This member would be required to give the church a whopping total of $208,000 for the year! Unfortunately, only a minuscule percentage of money (noted on internal ICOC pie charts), approximately 8-10% was disbursed for "special missions contribution." On information and belif, most of the money collected from ICOC members was used to pay upper leadership salaries.

59.     If the tithing budget was not satisfied, leaders or "disciplers" were forced to contribute the financial shortfall themselves, or members were required to **locate the offending member who failed to tithe and sit on their porch until they arrived home to obtain their tithe funds before Sunday evening was over**. The pressure to comply with the church's rigid demands was a source of anxiety and depression for many members. So much so that **several ex-members committed suicide**.

60.     In 2005, two former ICOC members filed a suit in Tennessee "claiming the church uses cultlike tactics, manipulation, peer pressure and guilt to force members into tithing and making other financial contributions." They alleged that for personal gain, "the Nashville Church, the [ICOC], Hope Worldwide, and Central and South America World Sector jointly participated in a scheme to defraud church members, who are not allowed to inspect the church's financial records."

61.     A former member named Tina witnessed Non-Disclosure Agreements being forced upon parishioners, claiming that they could never talk about the true finances of the Defendants despite evidence that ICOC opened offshore accounts containing massive quantities of cash.[9]

---

[9] Top leaders of the ICOC put "different ICOC assets and properties in their names" to shelter and hide those assets "so that the church didn't specifically own them." For example, The Bay Area Christian Church listed its address at the

62.     Moreover, McKean actively solicited church members to turn over their COVID-19 relief money to the church. The following are excerpts of emails from McKean to various church elders and leaders:

I would like to address the USA Churches, but I want all of the International Churches to realize "our" unprecedented situation and unprecedented opportunity. Recently, the USA Congress passed a 2 Trillion USD Stimulus Package. Already this week, many Americans received their $1,200 stimulus checks from the government. The World Sector Leaders knew this was coming, so we laid out a plan for every USA Church to help make Missions: 40% of the membership will give all of their stimulus checks; 40% give half; 20% raise their missions contribution pledge some other way. Prayerfully, many churches will exceed these goals!

Here are my charges for the USA Churches:

1. Call your members to give their stimulus checks ASAP. Americans are known to spend everything in their accounts. The great Chicago Church has called these $1,200 checks "Manna from Heaven!"

Presently, all around the world, if a member misses 2 or 3 weeks – usually recognized by missing 2 or 3 weeks of weekly contribution – this is a red flag that they may have become unfaithful. (There of course are always exceptions.) It is a fact that almost every USA Disciple has the ability to give online. So discipling in the COVID-19 Era must include how to give one's weekly contribution online.

Therefore, in the COVID-19 Era to show more forbearance and grace, if a person on your membership has not given for 4 straight weeks – remember this is the USA Churches not third world like India, the Philippines, Africa and some nations of Central and South America – then we must have the conviction that they have become unfaithful to God. At this point, after consulting your World Sector Leader then a decision needs to be made concerning the removal of their name from your membership. However, before that is done, the Evangelist or Women's Ministry Leader must contact them to see if there are extenuating circumstances. Take each situation on a case by case basis.

location of the HOPE Technology School for Autistic Children, which was owned by Bay Area Christian Church executive minister Russ Ewell. As of 2022, the property had a total assessed value of $7.7 million, all of which was exempt from taxes under another exemption. The Bay Area Christian Church also received a PPP loan of $764,600 in April 2020.

## ICOC AND ICC MEMBERS WERE SYSTEMATICALLY BRAINWASHED AND MANIPULATED INTO SILENCE

63.    Initially, early recruits received profound amounts of "love bombing" to lure them into a false sense of security, thereby allowing sexual predators to successfully manipulate them and eventually abuse them with the comfort of knowing these vulnerable and newly brainwashed people would never report the abuse.

64.    Each member is trained to understand, which they come to wholeheartedly believe that in connection with the church, **"compliance was the path of least resistance."** Members sincerely believed they needed to follow the Bible verbatim and **Defendants, including their leadership, were the only "true" modern-day disciples on Earth**.

65.    Church members were a dynamic and diverse group, consisting of scores of successful individuals such as doctors, lawyers, professional athletes, actors, teachers, business owners, PhDs, and **a remarkable number of leaders possessed psychology degrees**.

66.    It is without doubt that their education and training enabled these members to psychologically deplete members and manipulate children and their parents into submission, which created fertile ground for heinous sexual and physical abuse to thrive.

67.    One psychologist ICOC member currently owns a school for autistic children in the San Francisco area and he has been accused of multiple instances of sexual abuse of adults and children/teenagers while he was in Boston. ICOC and McKean were aware of this despicable man's repeated abuse, but **McKean orchestrated his relocation from Boston to San Francisco to conceal his predatory practices and avert criminal prosecution**.

/ / /

/ / /

/ / /

68.    McKean's carefully crafted church hierarchy lent itself to maintaining secrecy and preventing outside intervention. The following is a rough depiction of the church's organizational structure:



69.    Defendants' structure was purposefully organized in this manner to **ensure the abuse within the church remained a secret to all outsiders**, including the authorities. Indeed, someone within the church was always monitoring lower ranking members and giving them explicit instructions on how to conduct themselves.

70.    Questioning higher ranking members or the church in any manner was frowned upon. Some individuals were "disfellowshipped" or "marked" for being divisive if they asked too many questions or questioned any leaders. A member with either of these labels was **fiercely ostracized by the entire membership, including their families**. "Disfellowshipped" members are essentially excommunicated and shunned from Defendants' communities. Accordingly, being labeled as "disfellowshipped" or "marked" equated to hell on earth and in the afterlife for any member so labeled.

71.    In furtherance of the Abuse Enterprise, the pyramid hierarchy also paved the way for leadership to require that **all ICOC and ICC members receive mental**

health services (i.e., therapy) *exclusively* **from church therapist members**. The therapist members were biased in favor of the church and tailored their treatment and "findings" based on guidance and instruction from McKean and other leaders within ICOC and ICC. These therapist members' strong bias is best evidenced by the fact that a single instance of abuse was never reported to the police. In fact, these therapist members routinely instructed victims to refrain from reporting the abuse to the police, along with instructions to "forgive" the abuser for their heinous transgressions.

## DEFENDANTS CREATED A SICKENING CONVERSION THERAPY MINISTRY TO FACILIATE THE BRAINWASHING SCHEME THAT MANIPULATED ADULTS AND CHILDREN INTO SILENCE

72.    ICOC implemented a LGBTQ+ conversion therapy ministry called **Strength in Weakness spearheaded by Guy Hammond**. Strength in Weakness offers/offered its members three options: live the remainder of their lives celibate; partner with someone of the opposite sex; or continue living their homosexual life of sin and spend their afterlife in eternal damnation. Although "conversion therapy" is banned in several states, **ICOC used this ministry for conversion therapy under the pretext of a support system**. ICOC has held at least 20 Strength in Weakness "conversion therapy" seminars in states where conversion therapy is banned.

73.    The mere existence of Strength in Weakness is nothing short of ironic, as it became **common knowledge within the churches that Chuck Lucas had numerous homosexual relationships with young men in the church**. In a 2022 podcast with Steve Johnson, ICOC evangelist James Lloyd stated:

> "The truth is that the foundational "original sin" of our movement was homosexual sin. Man on man, specifically a male older leader, on young interns. And not just a few times—you can find out, it's not like nobody knows. The fact that our original sin was a senior leader (Lucas) who is respected and loved and training a group of young men—As the leader gets them in a room and shuts the door and this leader (Lucas) 'puts the moves' on these young men. And it's worse than it sounds because those

men then became ministers (perpetrators) and went out into their churches and did the same things to others—and I know that personally, because I was in some of those meetings where it was confessed.

They thought it was best not to share this with anybody, and I bought into those reasons. They would say things like, 'He's got children, he's got a wife, you can't just say those things out loud, it could hurt the faith of a young Christian.'

All these things are just the hierarchy and patriarchy saying that we don't need to bring this thing up about 'man on man.' And I don't personally think that this sin is any different than if it was between a man and a woman by the way— I'm only calling it sin because they weren't married.

But the real sin here is that we (church) hid it. People should be taught that this is how our group started. And some of that (sin) has continued for three generations. Some of that trauma was carried on, was passed on to other men as they went out into other (ICOC) churches."

## DEFENDANTS SHAMELESSLY PREYED UPON AND DEFRAUDED COLLEGE STUDENTS

74.     Defendants have increasingly focused on **recruiting college students**. By utilizing college campuses across the globe as its primary hunting grounds, they are more successful at grooming new members but have an opportunity at pecuniary gain by convincing them to pay for a worthless education. On information and belief, ICOC operates a campus ministry at Pepperdine University under the name "Alpha Omega" to conceal its connection to ICOC.

75.     The practice of preying upon college students resulted in numerous televised exposés in the mid-1990's when the ICOC cult commanded larger numbers, including but not limited to: 20/20 with Barbara Walters, Inside Edition, Fox News, BBC, and MTV.

76.     These news stories were explosive and highly negative representations of the church, as many parents were crying out to the media for help because their college aged children were being brainwashed by a cult. Some parents expressed that they felt like their children were kidnapped by ICOC.

77.     Indeed, ICOC and ICC's exploitation of college students ultimately resulted in the ICOC\ICC being **banned from on-campus recruiting from several schools across the nation**, including but not limited to Boston University, which is situated near the epicenter of the ICOC. Surprisingly, the exposés did not garner enough outrage among the general population, leaving the ICOC\ICC to continue to prey upon college students without repercussion. Until now, the ICOC has had the luxury of the benefits from their long-time obfuscation of their parasitic internal practices.

78.     Mr. McKean is so brazen that he **publicly admitted to defrauding students** by handing out unearned, illegitimate, and meritless doctoral degrees designed to both inflate the importance of its senior members and extract unearned pecuniary gains. The following are quotes from Mr. McKean taken from an ICC YouTube video:

> "The ICC runs an unaccredited college, called the International College of Christian Ministries, or ICCM, where they are handing out doctorates to anyone they choose, where the established course work is limited only to literature/books created within the ICC. This is why most leaders in the ICC put the abbreviation of "Dr" in front of their names, because they have been giving each other unaccredited doctorate status. The ICCM has already brought in approximately $6 million through ICC members attending this unaccredited college."
>
> *"During Covid, while the (financial) giving inside most religious organizations declined, our giving inside of God's Sold-Out Modern-Day Movement steadily increased! Due to our disciples receiving $3000 each in stimulus checks, and approximately $6000 total per*

*couple, these members turned over that stimulus money to the church. As a matter of fact, the sold-out ICC Disciples are now giving $250K every single WEEK!"[10]*

*"In addition to this money, and according to God's promise of always taking care of his people, the Sold-Out movement was further blessed by the government providing SBA loans to our members. Therefore, we were able to bring in $1.2 million of SBA loans to God's sold-out movement. We in turn used this SBA loan money to start 22 churches around the world. Isn't that incredible!! To God be the glory!"*

## DEFENDANTS ACTIVELY CONCEALED ABUSE, INCLUDING THE FORCIBLE RAPE OF A 3-YEAR-OLD GIRL

79.   The active concealment of systemic abuse within the churches by a **den of "religious" sexual predators** was the impetus of a devious and rampant culture of psychological abuse and manipulation, willfully ignoring the pervasive sexual abuse of children and adults throughout the churches and actively concealing abuse from the authorities.

80.   In furtherance of efforts to protect the church and its primary source of revenue (its members) at all costs, Defendants attempted to cover up these disgraceful crimes by manipulating members with remarks from McKean such as:

*"We cannot report these abuses, because it would hurt our church, which is God's Modern-Day Movement."*
*"Do you want the fall of God's modern-day movement on your head???!!"*
*"The cause of protecting God's Kingdom on earth is more important than the sin or the pain of a few individuals."*
*"We need to forgive our brothers who sin and realize that they are a new creation in Christ, and give them a chance to make things right. If we report them, it will destroy their lives and hurt the church."*

---

[10] Currently, the sold-out ICC Disciples are now giving approximately $360K per week.

81.   In addition, the church engaged in strategic victim blaming and victim shaming. For example, **young children who were abused were later blamed for that abuse when the ICOC would assert how their clothing was "too provocative"**.

82.   One former member of the East Region Los Angeles ICOC was pressured and ultimately convinced to refrain from reporting her 3-year-old daughter's abuse. She was told that if she reported the abuse, it could "ruin everything" and bankrupt the church. **McKean himself contacted this woman and personally thanked her for her "loyalty" and for not reporting the abuse to the police**. He congratulated her on her strength and courage to endure the situation with such faith.

83.   An ICOC affiliate, formerly known as AMS Ministry of the Los Angeles ICOC, and currently known as **Turning Point Church has similarly facilitated and concealed abuse**. Recently, Turning Point Church claimed publicly that no sexual abuse has occurred in their church, however, there are at least three survivors that reported abuse to staff members who took no action with the reported abuse and never alerted the congregation to the existence of sexual predators, some of whom worked in Kids Kingdom (children's ministry).

84.   Turning Point Church's leadership that ignored reports of abuse include the following: Kevin and Tracena Holland, Mike and Kim Upton and Jay and Traci Minor. In addition to the foregoing, Turning Point Church uses a licensed "Marriage & Family" counselor named David Bruce, who is a mandated reporter. Mr. Bruce, notwithstanding his knowledge of abuse, refused to report several instances of abuse and helped conceal the abuse for the Defendants' benefit.

85.   One former member of the Los Angeles ICOC and the Turning Point Church, Sandi Derby, Advanced Grief Recovery Specialist, Trainer for The Grief Recovery Institute and Ordained Minister, has "firsthand knowledge that allegations of sexual, physical, and psychological abuse of teens and adults were brought to leaders in Turning Point in 2019 for abuses that occurred in the early 2000s." This former member witnessed leadership's failure to support the abuse survivors and their failure

1  to report the abuse to the police. As a result of her open support for the survivors, this
2  former member was discredited within the church, which eventually led to her
3  defection.

4      86.    The Hampton Roads ICOC location in Virginia has also received reports
5  of abuse and done nothing in response. Specifically, Ed and Dr. Deb Anton were
6  informed of the sexual abuse of a teen ministry member and refused to report the abuse
7  or alert the congregation to the existence of a sexual predator within the church.

8  ### DEFENDANTS' DOCTOR MEMBERS ILLEGALLY MEDICATED YOUNG
9  ### CHILDREN IN FURTHERANCE OF THE ABUSE ENTERPRISE

10     87.    Defendants' abuse went far beyond physical, psychological, and financial
11 exploitation. Many children, such as Anthony Stowers, were administered medication
12 by church affiliated "doctors". Often, the affiliate doctors such as Dr. Kris Stowers
13 (Anthony's uncle) would administer medications that were prescribed for other
14 conditions or children received medication for conditions for which they were never
15 diagnosed. To conceal their illegal conduct and minimize scrutiny, **Defendants'**
16 **doctors provided the children with medication in unmarked or mismarked**
17 **bottles**.

18     88.    One of these affiliate physicians is a staff doctor at Florida State
19 University and another that has **administered medications to children for mental**
20 **illness despite lacking any qualification to do so medically or through public**
21 **license**. On information and belief, this physician is an orthopedic surgeon for athletes.

22     89.    **Medicating children has also facilitated the ICOC's clandestine**
23 **efforts to conceal the ongoing child abuse from anyone outside the church**. The
24 children were persuaded to believe, through strategic pharmacological deception and
25 psychological manipulation, that they were never abused and if their own memories
26 seem contradictory, then their memories were faulty.

27 / / /

28 / / /

## DEFENDANTS LEVERAGED CHILDREN'S MINISTRIES TO EFFECTUATE THE ABUSE ENTERPRISE

90.     The children's ministry was named the **"Kids Kingdom", which served as a demented playground for the multitude of sexual predators within Defendants' churches**. Countless instances of abuse happened within the Kids Kingdom, as the program hosted mission trips (HOPE Worldwide), social events and the children frequently visited members' homes.

91.     Defendant HOPE Worldwide is ICOC's benevolent arm wherein teenagers took mission trips around the world to spread God's Word. Many of these children who were participating in what they believed to be an evangelical trip, were ultimately sexually abused by vile adult men. Children and/or their parents reported the sexual abuse, including rape, to elders and doctors (i.e., mandated reporters) within the church, however, the church never bothered notifying the police of the illegal activity. **There were no instances of any ICOC medical doctors reporting the abuse to anyone, let alone anyone outside the church**.

## DEFENDANTS PROMOTED THE DEPLORABLE PHYSICAL ABUSE OF CHILDREN UNDER THE GUISE OF "DISCIPLINE"

92.     In addition to sexual abuse, ICOC and ICC children were routinely physically abused under the pretext of "discipline". Church leadership often recited the following commonly known passage from Proverbs 13:24 as justification for child abuse: "Those who spare the rod of discipline hate their children. Those who love their children care enough to discipline them."

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

93.   For example, members were instructed to **spank children, including infants, with a wooden paddle, custom made with a heart shaped hole in it, to create a more aerodynamic and effective (painful) spanking device**. A true and correct image of the heart shaped paddle is depicted below:



94.   Members were instructed, with visuals, how to **use corporal punishment without leaving bruises, welts or red marks, so the offending members could not be reported to child protective services**. One former member recalls frequently seeing young children at church with welts or bruises on their thighs. On one occasion, this member witnessed a child with a "heart shaped welt" on his/her body.

/ / /

/ / /

**1,200,000 PEOPLE DEFECTED FROM ICOC AND ICC AFTER
GROTESQUE ABUSES WERE EXPOSED**

95.    Since at least 1979, ICOC and ICC have averted suspicion by authorities notwithstanding the fact that in excess of the last 40 years, **predatory members have escaped prosecution for countless instances of sexual abuse (children and adults), physical abuse (adults and children), spousal abuse, and emotional abuse**.

96.    From its inception in 1979 to the present, approximately **1,200,000 souls defected from ICOC**. The large number of defectors is due, in large part, to the explosive growth that ICOC experienced.

97.    For three consecutive years, the ICOC was labeled in the religious world as the **fastest growing church on the planet**. Simply put, ICOC's growth was nothing short of profound. On the other hand, its bleeding was also profound, because members defected in record numbers as they became increasingly aware of the heinous, pervasive abuse of children and adults and the corresponding cover ups. These courageous souls would simply disappear, never again to be seen by anyone in the church.

98.    According to some of the most respected cult experts around the world, including but not limited to Dr. Steve Hassan PhD, Defendants are some of the most dangerous cults in existence. This is primarily because of the church's insidious tactic of masquerading as the Christian church next-door with a deeply rooted Biblical foundation. On its face, this public image of the church seems innocent and believable, however, **the church's internal machinations are characterized by unmitigated systemic and chronic physical and sexual abuse of children and adults of both genders within the church**.

99.    Defectors have since revealed the abuse they suffered and/or witnessed at ICOC and ICC. Former member Lisa Johnson who as a top leader in New York City and a friend of McKean, in a podcast called "Eavesdropping" made the following comments regarding the church, based on her personal experience. This is a quote by

Lisa Johnson from a recent episode of their podcast called "Eavesdropping."

> *"Women (in the ICOC) are getting ground up, and I mean tons of people, it's not an isolated case here and there….And I think about these women now, after all these years…*
>
> *So I'm gonna bring up something here…*
>
> *…The sexual abuse….there has been sexual abuse, there has been emotional abuse, and there has been some physical abuse of women… and part of that is the issue of patriarchy. We developed a system and a way that was not safe for women….There are women that have been very damaged and ground up by that.*
>
> *The fruit of this is so obvious, how can you miss it?! How many women have been told to stay with their physically abusive husbands and how many women have been sexually abused?!"*

## DEFENDANTS AUDACIOUSLY AND REPEATEDLY REFUSED TO REPORT PEDOPHILES WHO WERE LATER ARRESTED AND PROSECUTED

100.   Several pedophiles have been arrested in connection with various abuses. These individuals committed numerous crimes before the police intervened and are a miniscule representation of the true number of predators who have operated with impunity within the church since 1979.

101.   In January 2012, David Iburg, aka David Saracino ("David" or "David Saracino") was sentenced to 40 years of hard labor in the State of Louisiana, the maximum sentence, for **forcible rape upon a 4-year-old girl in 2004**.[11] The prosecutor, Cynthia Guillory, told the judge that he was among the worst of the worst.

---

[11] *State v. Iburg*, 12-2720 (La. 5/17/13), 118 So.3d 372

Mr. Saracino purposefully sought out women who were vulnerable and struggling financially so he could gain access to and victimize their young children. Mr. Saracino faced charges and convictions in Texas, Utah and Louisiana, where he received the 40-year sentence.

102.   Mr. Saracino attended the East Region of the LA ICOC, where several members (single mothers) of the ICOC reported to the leaders in the East Region in or about 1998 that David Saracino had continuously molested their daughters. Ultimately, several police reports were filed by the parents, while the ICOC remained silent. Just as the ICOC did nothing to address these reports while David escaped to the San Diego ICOC and freely resided in the Escondido area temporarily. Like so many others, these mothers were told not to share with anyone else what David had done, as it would "hurt the church."

103.   David ultimately disappeared uncaptured. David was free to go on a nationwide crime spree, abusing and raping little girls along the way. David was finally caught, but only after an episode of America's Most Wanted produced credible leads that resulted in his capture. Had ICOC assisted in his arrest or alerted their congregations, David Saracino could not have continued abusing children with reckless abandon. ICOC's commitment to abject apathy is sickening and clearly intentional.

104.   Since December 31, 2022, at least four of David's previously unknown victims from the East Region Los Angeles ICOC have come forward regarding the abuse they endured, and it is believed there are scores of additional victims who are either too entrenched in the church or too scared to tell their stories.

105.   In or about February 2018, a volunteer soccer coach named Waldo Milla-Guerra of Middlesex County, New Jersey was arrested on charges of possession and distribution of child pornography. Mr. Milla-Guerra volunteered at the South Brunswick Soccer Club and formerly taught at Kid's Kingdom at Central Jersey Church of Christ in North Brunswick.

106.   In 2005, Benjamin Samuel Speights, a member of the south region of the LA ICOC, was convicted for lewd and lascivious acts against a child under the age of 15. Mr. Speights' unlawful conduct included forceable participation of a 14-year-old girl to create pornographic videos that he sold.

107.   In December 2020 Mr. Speights was convicted in Arizona in connection with a Class 2 felony of sexual exploitation of a minor as part of a negotiated plea deal related to child pornography charges. Mr. Speights was a leader in the "Kid's Kingdom" ministry in the El Segundo South Region of the Los Angeles ICOC. Several children at this ministry reported his physical abuse. Without a doubt, Mr. Speights has a sordid and despicable history of abusing children. Consistent with their historic complicity, Defendants never reported the abuse these children endured or attempted to prevent future abuses.

108.   Nicholas Griffin Lombardi ("Mr. Lombardi") is another example of a known pedophile abusing children within Defendants' churches. He was a long-standing member of the ICOC, as were his parents. On or about November 27, 2022, as a clear demonstration of the kind of monster Mr. Lombardi truly is, Mr. Lombardi posted on his personal Facebook page "I kind of have a fantasy of fucking a child ha[.]"

109.   Mr. Lombardi was convicted for lewd and lascivious acts against a child under the age 15. In addition, there are numerous accusations of abuse against Mr. Lombardi, however, Defendants refused to report his abusive conduct to the authorities, and he remains free to continue abusing children with impunity.

110.   In approximately August 2011, one ICOC abuser, William (Bill) Thomas McLaughlin, was sentenced to 6 years to life, followed by 10 years to life of parole for various counts of felony sexual assault on a child by a person in a position of trust.[12] He abused approximately 10-15 individuals, all of whom were expelled or in some fashion pushed out of the Denver ICOC as punishment for failing to comply with the

---

[12] https://castlerocknewspress.net/stories/denver-man-sentenced-in-douglas-county-for-sex-assault-on-child,117951

leaders' commands.

111.   Tomotaka ("Tom") Andrews Wilton of the Portland, Oregon ICC location raped a child[13] for years and church leaders, including McKean, were acutely aware of the abuse but did nothing to warn anyone regarding this despicable predator's presence. He was convicted in Idaho in 2009 of two counts of third-degree rape of a child and is now a registered sex offender. On information and belief, Mr. Wilton remains a member of the Portland ICC and is free to abuse other children.

**Tomotaka Andrews Wilton Registration Details**
Last Known Address: 2509 W BOISE AVE
BOISE, ID 83706-2920
ADA COUNTY, ID



DOB:       1971-11-04

Race:
Asian Or Pacific
Islander

Sex:       Male

Eyes:      Brown

Height:    5 ft 3 in

Hair:      Brown

Weight:    173 lbs.

**Tomotaka Andrews Wilton - Registered Sex Offender**

VIEW CRIMINAL RECORD

**Offense or Statute**

Offense/Statute: Rcw 9a 44 079 Rape Of A Child In The Third Degree
               Charge Correlation Pending
Date:          17 March 2009

/ / /

/ / /

/ / /

/ / /

/ / /

---

[13] http://www.isp.idaho.gov/sor_id/SOR?id=35071&sz=1360; https://www.homefacts.com/offender-detail/IDSX35071/Tomotaka-Andrews-Wilton.html

112. The active concealment and protection of known pedophiles was pervasive particularly in the Texas ICOC churches, which is consistent with an ethos that in Texas, "we don't call 911". Indeed, this slogan is branded on apparel and other retail items such as the following t-shirt and snow globe:



/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

113.   There are at least 4 known pedophiles who were allowed to run rampant within the churches without any notification to the congregation that their children were in danger.

114.   Karim Torres was convicted of indecency with a child by contact and on information and belief, he is currently a Bible talk leader and he has served several Texas ICOC locations. He and his wife are known to frequently visit other ICOC churches as speakers at family retreats.



Offense: INDECENCY WITH A CHILD BY CONTACT

| Statute | TEXAS PENAL CODE 21.11(a)(1) |
|---|---|
| Victim Sex | Female |
| Victim Age | 16 |
| Disposition Date | 07/19/1999 |
| JUDGMENT | 3YPROBATION/COMMUNITY SUPERVISION |

Photo Reported - 04/10/2006



Photo Reported - 01/08/2001

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

115.   Warren Inman was convicted of at least three counts of indecency with a child in or about February 2021 in Denton County, Texas, Case No. F-2012-0728-D. He was a member of the Dallas ICOC and lives in Denton County. He was a worship leader and allowed college students to live in his home, as he regularly had college worship group meetings at his home. Mr. Inman has been in and out of prison and was finally arrested for child molestation. On information and belief, he was *not* reported to the police by ICOC.



/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

116. Joseph Ursini has multiple arrests and has been in and out of the ICOC fellowship over the years. On information and belief, none of the Texas ICOC churches, including the Dallas location, have reported Mr. Ursini's criminal conduct to the relevant authorities.



DALLAS

11 MONTHS AGO

**Ursini, Joseph** Mugshot | 2022-02-12 16:20:00 Dallas County, Texas Arrest

Booking Details name URSINI, JOSEPH dob 1980-09-30 age 41 years old race White sex Male booked 2022-02-12 Charges Information about charges is not available yet

117. Luis Miguel Quiroz was the subject of several individuals' reports to ICOC regarding extreme sexual abuse of several minors. However, the church did nothing and he was finally arrested approximately 10 years after the reports were made to the church. Luis is the brother of Dr. Carlos Quiroz, an ICOC pediatrician.

Home » Texas Mugshots » Fort Bend County Mugshots » Quiroz,luis Miguel Mugshot | 2017-07-05 20:26:00 Fort Bend County, Texas Arrest

| QUIROZ LUIS MIGUEL

ON 2017-07-05 20:26:00          FORT BEND COUNTY, TX MUGSHOTS

COMPLAINT

## SPECIFIC ALLEGATIONS

## The Torture and Sexual Abuse of Plaintiff Anthony Stowers

118.   Anthony Stowers ("Anthony"), a transgender man, was born in Florida in 1993 and currently resides in New York. At birth, Anthony was named Emily Rebekah Stowers. On or about the fall of 2016, He changed his name from Emily to Anthony and began transitioning.

119.   Anthony's uncle is Kris Stowers, an orthopedic surgeon, an ICOC church leader and evangelist of the Crossway ICOC. Anthony's father is Randal Stowers, who is Kris's brother. During his childhood, Anthony visited the home of Kris and his wife, Alison, quite often. In approximately 1986, Kris Stowers followed Chuck and Ann Lucas to help build what was called Cornerstone Church with Lucas. Kris Stowers stayed there until approximately 2005 when he left Cornerstone Church (formed by Chuck Lucas after he was forced out of ICOC) and joined a group that formed the new Crossway Church. Crossway was and remains an ICOC affiliate, although the congregation claims otherwise, presumably to shield itself from ICOC's sordid past.

120.   To minimize and to cover up Lucas' conduct that led to his ouster from ICOC, Kip McKean and the ICOC leadership publicly claimed that Lucas was forced out because of "recurring sins, " but there was zero public mention of the rampant sexual abuse. In furtherance of the cover up, the ICOC leadership never reported Chuck Lucas' abuse to law enforcement.

121.   Throughout his childhood, Anthony was systematically and intentionally indoctrinated by ICOC to believe that: only members of ICOC were to be trusted; he must comply with any requests he received from adults; all medical treatment should occur within the ICOC by its members; and any reports to the authorities, including Child Protective Services, would result in Anthony being taken into foster care custody where he would be raped daily.

122.   Anthony's time was strictly monitored and he was discouraged from spending time outside of school with anyone other than church friends, as his parents

and/or other ICOC leaders thought his school friends had "progressive values." Anthony believes this was because the church did not want anyone influencing him and/or because the church did not want to give him an opportunity to disclose the abuse to outsiders. The end result was that Anthony constantly felt like he was under constant surveillance and scrutiny.

123. **Anthony's recalls being molested at the age 3-4 while in the care of the ICOC pre-school, Noah's Ark**. Anthony recalls adult men, who at the time, were leaders and/or members of ICOC were allowed unfettered accessibility to the pre-school, despite not being teachers or otherwise, and as a result Anthony recalls many instances of being taken by Michael Salter to a nearby property, also owned by ICOC where **Anthony endured sexual abuse by Michael Salter and others**.

124. **Anthony recalls being sexual abused and raped by Chuck Lucas beginning at least by age 3 and continuing for several years. The abuse by Chuck Lucas occurred at Chuck Lucas' residence in Thomasville, Georgia on Remington Avenue, at Cornerstone, at Chuck Lucas' private office, other locations and a hotel.** Anthony also recalls Ann Lucas, Chuck's wife, who also has a psychology degree, manipulating him and others.

125. When Andy was approximately between 8 to 12 years old, Peter O'Donnell, an ICOC member oversaw organized equestrian exhibitions at Saddlebrook Farms summer camp, which was run from Peter O'Donnell's home. Peter O'Donnell is a convicted felon, including but not limited to embezzlement.

126. ICOC church events were also occasionally held at Saddlebrook Farms. At one of these exhibitions at SaddleBrook Farms when many other children were on site for the event, Peter O'Donnell, beckoned Anthony into his office, where he was sitting, and said, "Come over here," and when Anthony walked over, **Peter O'Donnell exposed his erect genitals to Anthony**. **Anthony was also taken to other church sponsored sporting events where he was fondled and passed around to various adult men**.

127.   Unfortunately, Anthony has seen nude pictures of himself, and is also aware of videos of himself taken when he was a child, however, he has no recollection who created the photos and videos.

128.   **Andy was also sexually abused by his father, a member of ICOC**. The sexual abuse at the hands of his father allowed the ICOC to maintain complete control over every facet of Andy's life. Randal Stowers and Kris Stowers also facilitated other ICOC members and outside men in their horrific sexual abuse of Anthony, including, arrange for transportation to and from various locations.

129.   Anthony was continuously sexually abused by his father, Randal Stowers, a school teacher and a member of ICOC and Kris Stowers' brother. Anthony's first memories of the sexual abuse from his father Randall, occurred when he was 3 years old and continuing thereafter until Anthony left home in his teenage years. **Anthony does not recall a time when his father was not abusing him in some fashion**. Randal's abuse ranged from grooming, molestation, unwanted and inappropriate touching in front of other people, forced kissing, sexual and emotional manipulation, rape, threatening behavior, and participating, facilitating or allowing the sex trafficking of Anthony.

130.   Anthony attempted to report the abuse within ICOC to counselors and teachers at his high school where his father Randal worked, but those pleas for help were always squashed for reasons that Anthony does not understand to this day. Shockingly to teenage Anthony, mandated reporters within the ICOC, such as counselors, doctors, and psychologists actively concealed his reports of abuse and took no remedial action.

131.   After enduring a lifetime of brainwashing and extreme psychological manipulation by ICOC, **Anthony spent his entire adult life believing that the crimes perpetrated against him were acts in furtherance of God's will**. Defendants deliberately coerced Stowers and other ICOC members into believing their suffering was not actual suffering, and if they reported the heinous crimes, they would endure a

suffering like nothing they had never experienced before.

132.   Only upon his escape from ICOC in late 2016 did Anthony begin to realize the myriad of emotional and psychological harm he suffered at Defendants' hands.

133.   As a direct and proximate result of Anthony's abuse and cover up by Defendants, Anthony suffered and continues to suffer a litany of injuries. Among other injuries, Anthony has experienced and will continue to experience for the rest of his life include severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**The Torture and Sexual Abuse of Plaintiff Erin Tomlinson**

134.    Erin is a 36-year-old non-binary person who was a member of ICOC's Chicago location and Erin currently resides in Chicago, Illinois.

135.   Erin's parents were members of ICOC and in 1987, the family moved from Oklahoma to Chicago when Erin was one year old.

136.   While living in Chicago, Erin was abused by their father, Eric Tomlinson, who was a respected leader of the Chicago ICOC and served as an occasional teacher in the Kids Kingdom Ministry. Erin's father was initially employed as a social worker and worked with children who were wards of the state of Illinois, including the Mercy Home for Boys and Girls. Consequently, Erin's father was a mandated reporter at all relevant times. Eric Tomlinson later obtained a PhD in psychology.

137.   All ICOC members and leaders were forced to confess their sins, temptations and weaknesses on a daily basis, thus, it stands to reason that Eric Tomlinson would have confessed his crimes to other ICOC members, none of which reported the criminal conduct to the authorities.

138.   Erin's first memory of being molested by Eric happened approximately at the age of age 4, although Erin suspects the abuse could have begun much earlier, as they have visions and memories, but no cognitive memories until age 4. The abuse was

comprised of "affectionate tickling," of their genitals and Erin also recalls a high-pitched sing-songy, baby-like words accompanying the abuse. The abuse was framed to Erin as lighthearted, affectionate, silly, normal, and even loving.  Erin's abuse and lack of personal autonomy became a normalized part of Erin's life and how the family functioned. Erin quickly understood they could not deny Eric any "fatherly" affection of any kind.

139.   After Erin reached a certain age, Eric stopped overtly sexually abusing Erin, but he did not stop physically abusing Erin. For example, as Erin grew older, the nature of his abuse shifted. Eric no longer fondled Erin's genitals, but he continued to touch Erin's body in ways Erin did not like and even protested against. Every time he walked past Erin, he touched or squeezed Erin, often on the shoulders. Erin would flinch away, ask him to stop, or even yell at him, however, he responded in a manipulative manner that sought to make Erin feel guilty for the abuse.

140.   Eric's "forcible hugs" made Erin experience familiar and triggering thoughts and emotions, to wit, Erin was victimizing Eric by withholding affection he was owed.

141.   Eric's abuse did not stop with Erin, as there are reports of Eric sexually abusing other children from Kids Kingdom. Erin's younger sister also received the same forced "affection," as it was a normalized part of their family dynamic.

142.   Erin was between the ages of 8 and 10 at the time when Erin, Erin's sister and Eric were standing near the front yard of the home of a family that Erin knew well from ICOC.  One of the daughters of that family was standing with them and Erin watched Eric reach down and "tickle" the little girl's genitals in an all too similar fashion. Erin immediately pleaded with him and said, "Dad, you can't do that.  She's not 'our' family." Erin had become so brainwashed that Erin genuinely believed genital "tickling" was acceptable within the family.

143.   Around the age of 17, Erin's mother told Erin that their dad had repeatedly cheated on Erin's mother, and said that Eric confessed to being a sex addict. Erin's

mother eventually divorced Eric in 2017, long after the permanent damage to Erin had been done.

144.   Erin, like many children who suffered at Defendants' hands, was abused with the ICOC inspired wooden paddle with a heart shaped hole. The paddle was hung on the wall of the family kitchen as a constant reminder of the consequences of Erin's defiance.

145.   When Erin's father disciplined them, he would often start by saying Erin was being spanked because he loved Erin. Eric would then lay Erin across his lap and passionately beat Erin's bottom with the paddle. Sometimes he would use his belt when the beatings were impulsive and spurred by Eric's rage. As a result, Erin lived in constant fear of being physically abused with the paddle or a belt if they defied Eric.

146.   The beginning of Erin's teen years were extremely unstable and traumatic. Between the ages of 14 and 15, Erin left ICOC, dropped out of high school and attempted suicide twice. These two years would have been an opportune time for Erin to seek therapy or counseling or to find someone to talk to. Instead, Erin was prescribed psychiatric medications that worsened Erin's symptoms and contributed to their further social isolation. Erin suspects this is due to their father not wanting Erin to disclose the abuse to a therapist.

147.   This pattern lasted into adulthood whenever Erin was around Eric. Eventually, Erin cut off all contact with Eric, around 2017. Despite Erin telling him to no longer reach out to them, he has continued to initiate unwanted contact up to present day.

148.   Although Erin has been forced to live with a lifetime of trauma and devastation resulting from the systematic abuse Erin suffered at Eric's hands, Eric has been free to continue his life as a sexual predator and psychologist without consequence. Alarmingly, before retiring Eric continued working with children and earned five certificates in child and adolescent functioning, assessment, and training. On information and belief, Eric is currently residing in the Gainesville, Florida area and

1  was previously working as a coach with the "Research Lead" at the Institute
2  forConflict.[14] Over the years, rumors have circulated that Eric abused children while he
3  worked at Mercy Home for Boys and Girls.

4      149.   Eric's coaching/therapy services included using the "Jungian Advanced
5  Motor Processing" therapy method, which is purportedly "known to be highly effective
6  in reducing the following negative effects of dis-regulated emotional states and
7  psychological disorders: Anger, Sadness, Numbness, Confusion, Worry, Fear, Hurt,
8  Negative Beliefs, Disbelief, Rage, Anxiety, Minimization, Denial, Pain, Revulsion,
9  Guilt, Shame, Betrayal, Withdrawal, Embarrassment, Jealousy, Despair, Self-Blame,
10  Doubt, Revenge, Dissociation, Shame, Trauma, Complex Trauma, PTSD, Anxiety,
11  Body Image, Stress, Negative Thinking Patterns, Negative Self Talk, Self-Hate, Panic
12  attacks, Panic Disorder, Sexual Trauma, Physical Trauma, Childhood Abuse,
13  Childhood Sexual Abuse, Phobias, Body Dysmorphic Disorder, Eating Disorders,
14  Disturbing Thoughts & Memories, Flashbacks, Dissociative Disorders, Psychosomatic
15  Disorders, Transitioning off of Psychotropic Medications, Sleep Disturbances, Self-
16  Esteem and Self Defeating Behaviors."

17      150.   Ironically, Eric provided coaching and therapy services to individuals who
18  suffer from the same mental illness symptoms, including childhood sexual abuse and
19  sexual trauma, among many others, that he created for Erin by sexually and emotionally
20  abusing Erin for multiple decades.

21      151.   Erin has been unable to sustain healthy social relationships, cycling
22  through the abusive and exploitative relationships their father groomed them for. Erin's
23  mental health struggles prevent them from working more than a handful of hours a
24  week.

25      152.   Erin has been diagnosed with Post-Traumatic Stress Disorder (PTSD) and
26  Developmental Trauma. Together, these two are known colloquially as cPTSD (the "c"

27
28
[14] https://www.instituteforconflict.com/blank-3

stands for "complex"). Erin has also been diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder. In addition to these medical conditions, Erin also has MCAS (Mast Cell Activation Syndrome), which is similar to an autoimmune disorder, but correlated to trauma.

153.   Erin is also on several psychiatric medications and is in therapy doing intense trauma work. Erin was also diagnosed with "high tone pelvic floor," which is a pelvic floor dysfunction where the pelvic muscles are chronically tight and cause a number of secondary issues. Erin has a profoundly deep feeling of shame, the hallmark of sexual abuse, associated with feelings that Erin can only describe as, "It's my fault."

154.   As a direct and proximate result of Erin's abuse at the hands of Eric, ICOC, and its leadership, Erin suffered and continues to suffer a litany of injuries. Among other injuries, Erin has experienced and will continue to experience for the rest of Erin's life include severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

## FIRST CLAIM FOR RELIEF
## SEXUAL ASSAULT OF A MINOR
*(Against All Defendants and Does 1-100)*

155.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

156.   Defendants intentionally, willfully, and maliciously sexually assaulted and/or sexually abused and molested Plaintiff during the time that Plaintiff was a minor.

157.   In committing the unlawful acts of sexual assault against Plaintiff, Defendants intended to put Plaintiff in imminent apprehension of harmful or offensive contact.

158.   Defendants put Plaintiffs in imminent apprehension of such harmful

offensive contact as Plaintiffs actually believed the Defendants had the ability to make harmful or offensive contact with plaintiff's person.

159.   Plaintiffs did not consent to Defendants' intended harmful or offensive contact with plaintiff, Defendants' intention to put Plaintiffs in fear of imminent apprehension of such contact, plaintiff was a minor during the time herein alleged and, therefore, lacked the ability to consent to sexual contact with any person, including Defendants.

160.   As a direct and legal result of this conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

161.   Defendants conduct described herein was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish, and emotional and physical distress.

162.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages in an amount to be determined by the Court.

## SECOND CAUSE OF ACTION
### VIOLATION OF PENAL CODE 647.6(a)(1)
*(Against All Defendants and Does 1-100)*

163.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

164.   California Penal Code § 647.6(a)(1) provides that "[every person who aims or molests any child under 18 years of age shall be punished by a fine not

exceeding five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."

165. As alleged herein, Defendants engaged in sexual penetration with Plaintiffs while Plaintiffs were under eighteen years of age, in violation of California Penal Code § 647.6(a)(1).

166. Under California law, victims of childhood sexual abuse are entitled to bring civil actions for violations of Penal Code provisions that prohibit adults from engaging in sexual acts with minors, including Penal Code § 647.6(a)(1). See Angie M. v. Superior Court, (1995) 37 6 Cal.App.4th 1217, 1224-1225.

167. Defendants above-noted actions in annoying and molesting the minor Plaintiffs was the proximate and legal causes of physical, psychological, emotional, and economic damages Plaintiffs have suffered and continues to suffer to this day. It also has resulted in Plaintiffs incurring, and will require Plaintiffs to incur into the future, expenses for medical and psychological treatment, therapy, and counseling.

168. The above-described conduct of Defendants was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety of Plaintiffs, and was carried out with a conscious disregard of Plaintiffs right to be free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to California Civil Code section 3294, entitling Plaintiffs to punitive damages against the Defendants in an amount appropriate to punish and set an example of them.

## THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(Against All Defendants and Does 1-100)*

169. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

170. The conduct of all Defendants as set forth in this Complaint was extreme

and outrageous, and committed with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

171.   A reasonable person would not expect or tolerate the sexual assault committed by Defendants.

172.   A reasonable person would not expect, accept or tolerate Defendants' unlawful sexual assault and/or sexual abuse, and molestation of Plaintiffs.

173.   Defendants' conduct exceeded all bounds of that usually tolerated in a civilized community.

174.   Defendants intended to cause Plaintiffs injury when they sexually assaulted Plaintiffs, manipulated and brainwashed Plaintiffs into silence and actively concealed Plaintiffs' abuse.

175.   Plaintiffs have suffered severe and/or extreme distress as a result.

176.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

177.   Defendants' conduct described herein was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish and emotional and physical distress.

178.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are, therefore, entitled to the recovery of punitive damages, in an amount to be determined by the Court.

/ / /

/ / /

/ / /

**FOURTH CAUSE OF ACTION**
**NEGLIGENT HIRING, SUPERVISION, AND RETENTION**
*(Against All Defendants and Does 1-100)*

179.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

180.   At all times relevant, a special relationship existed between Defendants and Defendants, because Defendants were the agents of Defendants, each of whom had the ability to control of Defendants' conduct, yet failed to exert it. In doing so, Defendants created a widespread culture of acceptance of the abuse of children, as Defendants and Defendants collectively brainwashed and manipulated Plaintiffs to remain silent about the abuse and these Defendants also actively concealed the abuse to avert discovery by the authorities.

181.   At all times herein. Defendants, and each of them, negligently supervised, managed, and controlled Defendants in their membership and participation in Defendants' Church, and negligently failed to warn Plaintiffs, Plaintiffs' parents, and other members of the Church, of the propensity and risk that Defendants would sexually assault, sexually abuse, and/or molest minor children, a propensity and history of which Defendants, and each of them, acting through their employees, agents, and volunteers, had actual notice.
During the same time period, Defendants, and each of them, were negligent in failing to exercise reasonable care to protect Plaintiffs, and other minors, who were members of, or participants in, activities at Defendants' Church, from the risk of sexual assault, sexual abuse and molestation by perpetrators, including the Defendants.

182.   Defendants were further negligent in failing to notify law enforcement and other appropriate authority that Plaintiffs were and/or continued to be a victim of child abuse/assault by the Defendants when they learned of this fact. Defendants' failure to report the known and/or reasonably suspected child abuse of Plaintiffs, but

instead Defendants perpetuated and facilitated Defendants' continued sexual abuse and/or sexual assault, and molestation of Plaintiffs.

183.   If Defendants satisfied their duty to take reasonable steps to protect Plaintiffs all minor children, from known and/or foreseeable harm, including sexual assault, including reporting the sexual assault and/or sexual abuse, and molestation to law enforcement, then some or all of the Plaintiff's injuries would have been avoided.

184.   Prior to, during, and after the sexual assault of Plaintiffs, Defendants, through their administrators, employees, agents, and/or volunteers, had knowledge, and/or were otherwise on notice, that Defendants had and/or was engaged in, and/or presented the risk of, sexual assault of Plaintiffs, and other minors.

185.   Plaintiffs are informed, believes, and thereupon alleges that prior to, and during the Defendants' sexual assault and/or sexual abuse, and molestation of Plaintiffs, Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of Defendants' unlawful conduct, as set forth in this Complaint, but failed and/or refused to take any affirmative action, including but not limited to notifying law enforcement. Instead, Defendants directed Plaintiffs and Plaintiffs' parents to continue to have contact with Defendants thereby ratifying and facilitating Defendants' continued sexual assault and/or sexual abuse and molestation of Plaintiffs.

186.   Defendants breached their duties by failing to use reasonable care to protect Plaintiffs from their pastor, deacon, employee, and/or agent, to wit, Defendants.

187.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against her and the resulting harm.

188.   As a direct and legal result of Defendants' conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but

which exceed the minimum jurisdictional limits of this Court.

189.   Plaintiffs are informed, believes, and thereupon alleges that Defendants' failure to respond, investigate, terminate Defendants' employment, report, or take any other action following Plaintiffs, other minor children, and Plaintiffs parents' report of sexual assault and/or abuse by Defendants was part of Defendants' concerted effort to cover up and/or hide evidence related to childhood sexual assault of minor children, including Plaintiffs.

190.   Plaintiffs' damages as a result of Defendants' repeated sexual assault, abuse, and molestation of Plaintiffs was a direct result of Defendants' concealment and cover-up. As such. Plaintiffs are entitled to treble damages against Defendants pursuant to Code of Civil Procedure section 340.1(b)(2).

**FIFTH CAUSE OF ACTION**
**NEGLIGENT SUPERVISION OF A MINOR**
*(Against All Defendants and Does 1-100)*

191.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

192.   Defendants and McKean and Lucas (McKean and Lucas are collectively, the "Church Leader Defendants"), and each of them, were responsible for the care, custody, control, supervision, and protection of the minor children entrusted to them, including Plaintiffs.   Defendants and Church Leader Defendants had a duty to adequately and properly supervise, monitor, and protect Plaintiffs from known and knowable dangers, such as those posed by the Defendants.

193.   Defendants and Church Leader Defendants, and each of them, breached their duty to properly and adequately supervise, monitor, and protect Plaintiffs, in part because officers, administrators, agents, and other supervisory employees knew or should have known of the Defendants' improper behavior, including that minor children, including Plaintiffs, were frequently alone with Defendants without any

justification, that Defendants would frequently touch and sexually abuse minor children, including Plaintiffs, at Church Leader Defendants and Defendants' Churches without any justifiable reason for doing so, including when the minor children were by themselves, and Defendants sexually abused, assaulted, and/or molested minor children, including but not limited to Plaintiffs.

194.   Defendants and Church Leader Defendants, acting through their administrative and supervisory employees, knew or should have known that Plaintiffs were unattended and unsupervised with Defendants on numerous occasions, without any justification.

It should have been obvious to any officer, agent, administrator, employee, or staff member that there was no reason that neither Plaintiffs, nor any other child, should have been alone with Defendants. The employees and agents of Defendants and Church Leader Defendants instead turned a blind eye to the fact that Defendants were spending time with minor children, including Plaintiffs, unattended and unsupervised without any investigation into the matter.

195.   After engaging in grooming activity of Plaintiffs while spending time alone with Plaintiffs, Defendants started sexually assaulting, sexually abusing, and molesting Plaintiffs and other minor children on Defendants' premises and during Defendants and Church Leader Defendants' church related services. The acts of sexual assaults and abuse occurred while Plaintiffs were left unattended and unsupervised with Plaintiffs.

196.   If Defendants and Church Leader Defendants, and each of them, adequately and properly supervised, monitored, and protected Plaintiffs, Plaintiffs would not have been harmed, or would not have been harmed to the extent that Plaintiffs were.

197.   Defendants and Church Leader Defendants, and each of them, also recklessly and negligently failed to implement and/or enforce policies and procedures that were aimed at preventing or detecting sexual assault and assault of their minor

members.

198.   If Defendants and Church Leader Defendants, and each of them, adequately performed their duties and responsibilities, then Plaintiffs would not have been subject to the sexual assault, assault and harassment perpetrated by the Defendants.

199.   Plaintiffs have been severely damaged emotionally and physically, and otherwise, in amounts to be proven at the time of trial, but which exceed the jurisdictional limits of the Superior Court as a direct and legal result of the acts and omissions of Defendants and Church Leader Defendants, and each of them.

## SIXTH CAUSE OF ACTION
### FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP. BASED ON VICARIOUS LIABILITY
*(Against All Defendants and Does 1-100)*

200.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

201.   Defendants and Church Leader Defendants, through their administrators and employees knew or reasonably suspected that the Defendants had, and or was, engaged in the sexual assault of children while the children were under the care, custody, and supervision of Defendants, and each of them, and thus had a duty to report Defendants to the appropriate authorities under the California Child Abuse and Neglect Reporting Law. (Penal Code §§ 11164-11174.3, "CANRA".)

202.   At all times relevant herein and material hereto, Defendants were employees of Defendants and Church Leader Defendants. Defendants and Church Leader Defendants were responsible for hiring, training, supervising, and retaining Defendants as part of their church and youth bible studies program. Defendants and Church Leader Defendants' staff, employees, and administrators were required to report any suspected child or sexual abuse as part of their duties and responsibilities as

employees and/or agents of Defendants and Church Leader Defendants.

203.   Defendants' and Church Leader Defendants' administrators, board members, and employees are mandated reporters under Penal Code section 11165.7.

204.   Penal Code section 11166(a) states that a mandated reporter shall make a report to an agency whenever he/she, in his/her professional capacity or within the scope of his/her employment, has knowledge of or observes a child whom the mandated reporter knows, or reasonably suspects has been a victim of child abuse or neglect. "Reasonable suspicion" does not require certainty that child abuse or neglect has occurred but looks to if it is objectively reasonable for a person to entertain a suspicion to suspect child abuse or neglect. (Penal Code § 11 lr66(a)(l).)

205.   As set forth in this Complaint, Defendants and Church Leader Defendants, through their administrators, board members, and employees knew and/or reasonably suspected that children had been sexually assaulted by Defendants, prior to the Defendants' sexual assault of Plaintiffs, giving rise to a duty to report such conduct under CANRA.

206.   Defendants and Church Leader Defendants, through their administrators, board members, and employees knew that in the absence of the exercise of reasonable diligence, that an undue risk to minors, including the Plaintiffs, existed because Defendants' administrators, board members, and/or employees did not comply with California's mandatory reporting requirements.

207.   Defendants, through their administrators, board members, and employees, including but not limited to and Church Leader Defendants, failed to report the known and/or reasonably suspected child molestations and assaults, created the risk and danger contemplated by CANRA, and a result, unreasonably and wrongfully exposed Plaintiffs and other minors to sexual molestation and abuse,

208.   If Defendants, through their administrators, board members, and employees, including but not limited to the Church Leader Defendants, complied with CANRA's mandatory reporting requirements, then Plaintiffs would not have been

harmed at all or to the extent that she was.

209.   As a direct result of Defendants and Church Leader Defendants' failure to comply with CANRA's mandatory reporting requirements, through their administrators, board members, and employees. Defendants and Church Leader Defendants wrongfully denied the Plaintiffs the intervention of child protection services and constituted a per se breach of Defendants, through their administrators, board members, and employees, duties to Plaintiffs.

210.   As a direct and legal result of Defendants and Church Leader Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE**
*(Against All Defendants and Does 1-100)*

211.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

212.   Defendants owed a duty of care to the minor Plaintiffs or had a duty to control the conduct of the Defendants by way of the special relationship existing between those individuals and Plaintiffs.

213.   Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of the misconduct and sexually predatory behavior of the Defendants directed towards minor children, including Plaintiffs.

214.   Despite having knowledge of the misconduct of the Defendants, all Defendants herein failed to take any preventative action to control, curb, and/or prevent that conduct, failed to warn Plaintiffs or Plaintiffs' parents of that wrongful conduct, and/or failed to notify law enforcement, despite having a legal duty to do so.

215.   As a direct and legal result of Defendants' negligence, Plaintiffs were sexually assaulted, sexually abused, sexually harassed, and assaulted by the Defendants.

216.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against Plaintiffs and the resulting harm.

217.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## EIGHTH CLAIM FOR RELIEF
**Violation of Federal Racketeer Influenced and Corrupt Organization ("RICO") Act 18 U.S.C. § 1962(c)**
*(Against All Defendants and Does 1-100)*

218.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

219.   Plaintiffs bring this claim for relief under the private cause of action provided by 18 U.S.C. § 1984(c), which prohibits violations of the Federal RICO Act insofar as such violation injures any person in his business or property.

220.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

221.   The Abuse Enterprise, distinct from Defendants, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), organized within individual ministries, funneling into regions governed by individual bishops, and headquartered in Los Angeles, California.  Members of the Abuse Enterprise maintain a common purpose of extracting money from its members and perpetrating sexual abuse upon minor

children under the auspices of liturgical praxis and writings taught by its church ministers worldwide. The Abuse Enterprise began as early as 1979 and continues with a growing global membership of more than 120,000 today.

222.  Defendants have conducted and participated in the affairs of the Abuse Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

223.  Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260.

224.  Each Defendant, in their individual capacity, knew or should have known about the majority of the predicate acts carried out by Defendants within the Abuse Enterprise.

225.  Upon information and belief, some combination of Defendants have engaged in an uninterrupted course of unlawful conduct consisting of all of the herein described predicate acts.

226.  Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: (i) violating the prohibition against human trafficking under 18 U.S.C. § 1590; (ii) laundering of monetary instruments outside of the United States with the intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §1956(a)(2); and (iii) sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260 Upon information and belief, several hundred children have been sexually exploited as a result of this pattern of racketeering behavior.

227.  Upon information and belief, hundreds of individuals within Defendants' inner circles have been extorted through fear of financial and physical injury into making large financial payments to Defendants and into providing sexual services to

Defendants as a result of this pattern of racketeering behavior.

228. Upon information and belief, many millions of dollars have been trafficked out of the United States for the purposes of carrying on unlawful activity as a result of this pattern of racketeering behavior.

229. Upon information and belief, Defendants' pattern of racketeering behavior has been related and continuous since its inception.  Upon information and belief, there is not only a threat of continued criminal activity, but continued criminal activity is occurring within the Abuse Enterprise at the hands of nearly all Defendants as of the writing of this Complaint.

230. Defendants and the Abuse Enterprise regularly move goods, money, and people across state lines, and are therefore engaged in interstate commerce.

231. As a direct and proximate result of these patterns of racketeering behaviors, Plaintiffs have sustained damages, including lost wages, loss of economic opportunity, loss of educational opportunity, loss of future income, loss of specific extorted payments, physical injury, severe emotional distress, and additional economic losses.

232. Plaintiffs are therefore entitled to recover treble the damages she sustained in an amount to be proven at trial, the cost of the suit, plus a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

**NINETH CLAIM FOR RELIEF**
**Sexual Battery in Violation of Cal. Civ. Code § 1708.5**
*(Against All Defendants and Does 1-100)*

233. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

234. Plaintiffs bring this claim for relief under Cal. Civ. Code Section 1708.5, which prohibits sexual battery.

235. Plaintiffs bring this claim pursuant to California Assembly Bill 218,

amending Sections 340.1 and 1002 of the Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

236.   As alleged herein, Plaintiffs the victim of sexual battery as a minor perpetrated by the Defendants. Defendants subjected Plaintiffs to this sexual battery at the hands of while Plaintiffs were minors.

237.   Cal. Civ. Code § 1708.5 prohibits any act with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with the person results, or any act that causes an imminent apprehension of such harmful or offensive contact and the offensive contact results.

238.   Defendants knowingly conspired and/or aided and abetted to force Plaintiffs into sexual battery with Defendants, and such sexual battery did, on multiple occasions, occur.

239.   Plaintiffs were minors minor when Defendants sexually battered them.

240.   Each Defendant knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with the Defendants, all in furtherance of sexually battering Plaintiffs and in furtherance of the Abuse Enterprise.

241.   The sexual battery of Plaintiffs by the Abuse Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

242.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

243.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and

safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

244.   Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees, and other relief that the Court may deem proper.

### TENTH CLAIM FOR RELIEF
### Gender Violence in Violation of Cal. Civ. Code § 52.4
*(Against Defendants and Does 1-100)*

245.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

246.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 52.4, which prohibits acts of gender violence.

247.   Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the California Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

248.   As alleged herein, Plaintiffs were the victims of multiple instances of sexual battery as a minor perpetrated by the Defendants and facilitated by all Defendants herein.  Defendants subjected Plaintiffs to these multiple incidents of sexual battery at the hands of the Defendants while Plaintiffs were minors.

249.   Cal. Civ. Code § 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints,

charges, prosecution, or conviction.

250.   As alleged herein, Plaintiffs were repeatedly the victim of acts of gender violence by the Defendants while they were minors.

251.   Each Defendant herein knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Defendants, all in furtherance of committing acts of gender violence against Plaintiffs.

252.   The repeated sexual battery of Plaintiffs by Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

253.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

254.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care. Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

255.   Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees and other relief that the Court may deem proper.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully pray for relief as follows:

(a)   Compensatory and special damages in an amount to be proven at trial;

(b)   Statutory penalties and liquidated damages according to proof at time of trial;

1    (c)    Punitive and exemplary damages in an amount according to

2              proof at the time of trial;

3    (d)    Treble damages;

4    (e)    Pre- and post- judgment interest;

5    (f)    Reasonable attorney's fees and costs; and

6    (g)    Such other and further relief as the Court deems just and proper.

7

8    Plaintiffs respectfully demand a trial by jury on all claims so triable.

9                       **SAMINI BARIC KATZ LLP**

10    Date: February 7, 2023    By:    /s/ Bobby Samini

11                         Bobby Samini, Esq.

12                         Michael Katz , Esq.

Steve Baric, Esq.

13                         Nicole C. Prado, Esq.

14                         John S. Oney, IV, Esq.

Attorneys for Plaintiffs

15                         Anthony M. Stowers and Erin Tomlinson

16

17

18

19

20

21

22

23

24

25

26

27

28