**SAMINI BARIC KATZ LLP**
Bobby Samini, Esq. (SBN 181796)
Michael Katz, Esq. (SBN 181728)
Steve Baric, Esq. (SBN 200066)
Nicole C. Prado, Esq. (SBN 269833)
John S. Oney IV, Esq. (SBN 338596)
650 Town Center Drive, Suite 1500
Costa Mesa, CA 92626
Telephone: (949) 724-0900
Facsimile: (949) 724-0901
Email: bobby.samini@sbklawyers.com
Email: michael.katz@sbklawyers.com
Email: steve.baric@sbklawyers.com
Email: nicole.prado@sbklawyers.com
Email: john.oney@sbklawyers.com

*Attorneys for Plaintiffs,*
*Anthony M. Stowers and Erin Tomlinson*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY M. STOWERS, an individual; and ERIN TOMLINSON, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL CHURCHES OF CHRIST, INC., a California nonprofit corporation; THE INTERNATIONAL CHRISTIAN CHURCH, INC., a California nonprofit corporation; HOPE WORLDWIDE, LTD., a Delaware nonprofit corporation; MERCYWORLDWIDE, a California nonprofit corporation; CITY OF ANGELS INTERNATIONAL CHRISTIAN CHURCH, a California | Case No. 2:22-cv-09472-ODW-PLA <br><br> **SECOND AMENDED COMPLAINT FOR:** <br> 1. **SEXUAL ASSAULT OF A MINOR** <br> 2. **VIOLATION OF PENAL CODE 647.6(A)(1)** <br> 3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** <br> 4. **NEGLIGENT HIRING, SUPERVISION, AND RETENTION** <br> 5. **NEGLIGENT SUPERVISION OF A MINOR** <br> 6. **FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP.** |

1  nonprofit corporation; THOMAS
2  ("KIP") McKEAN, an individual; THE
   ESTATE OF CHARLES "CHUCK"
3  LUCAS; CROSSWAY CHURCH, a
4  Florida non-profit corporation;
   CORNERSTONE CHURCH OF
5  CHRIST, a Georgia non-profit
6  corporation; THE CHICAGO
   CHURCH OF CHRIST, an Illinois non-
7  profit corporation; and DOES 1 through
8  10, inclusive,

9              Defendants.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BASED ON VICARIOUS
LIABILITY**
7. **NEGLIGENCE**
8. **VIOLATION OF FEDERAL
   RACKETEER INFLUENCED
   AND CORRUPT
   ORGANIZATION ("RICO")
   ACT 18 U.S.C. § 1962(C)**
9. **SEXUAL BATTERY IN
   VIOLATION OF CAL. CIV.
   CODE § 1708.5**
10. **GENDER VIOLENCE IN
    VIOLATION OF CAL. CIV.
    CODE § 52.4**

**JURY TRIAL DEMANDED**

Plaintiffs ANTHONY M. STOWERS and ERIN TOMLINSON (collectively, "Plaintiffs") hereby submit this Second Amended Complaint pursuant to 18 U.S.C. §§ 1961 *et. seq.*, the California Civil Code, and the California Penal Code, under federal question and supplemental jurisdiction against Defendants INTERNATIONAL CHURCHES OF CHRIST, INC., THE INTERNATIONAL CHRISTIAN CHURCH, INC., HOPE WORLDWIDE, LTD., MERCYWORLDWIDE, CITY OF ANGELS INTERNATIONAL CHRISTIAN CHURCH, THOMAS "KIP" McKEAN, THE ESTATE OF CHARLES "CHUCK" LUCAS, CROSSWAY CHURCH, CORNERSTONE CHURCH OF CHRIST, THE CHICAGO CHURCH OF CHIRST and all other named and unnamed defendants (collectively, "Defendants") and states as follows:

## INTRODUCTION

1.     This action to recover damages on behalf of adult victims of childhood sexual assault is governed by Code of Civil Procedure section 340.01 ("section 340.01").

2.     The incidents of childhood sexual assault against Plaintiffs alleged herein were facilitated and actively concealed by Defendants while Plaintiffs were minors.

3.     This case arises from an ongoing and systemic scheme of abuse that shocks the conscience from its appallingly epic proportions. The ICOC and its affiliate churches have created a money-making enterprise through its psychological manipulation, tight control, and hierarchical "discipleship" structure.  That same structure fostered an environment fertile for sexual abuse.  Sexual predators gained unfettered access to manipulated women and children. They could abuse them without fear of accountability. Instead of taking action, the ICOC, its leaders, and its affiliates did more than turn a blind eye—together, they actively concealed the abuse in order to protect their mega-church tithing empire.  As a result, the ICOC and its leaders, from top to the bottom, aided and abetted the continued sexual abuse of women, minors, and even children as young as 3 years old, some of whom were raped and sexually abused with impunity by trusted church members.

## JURISDICTION AND VENUE

4.     This Court has federal subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1331 because it arises under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et. seq.*).

5. Pursuant to California's Code of Civil Procedure § 340.1(a), actions for the recovery of damages suffered as a result of childhood sexual assault shall be commenced within 22 years of the date the plaintiff attains the age of majority or within five years of the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual assault, whichever period expires later, for any of the following actions: (1) an action against any person for committing an act of childhood sexual assault; (2) an action for liability against any person or entity who owed a duty of care to the plaintiff, if a wrongful or negligent act by that person or entity was a legal cause of the childhood sexual assault that resulted in the injury to the plaintiff; or, (3) an action for liability against any person or entity if an intentional act by that person or entity was a legal cause of the childhood sexual assault that resulted in the injury to the plaintiff.

6. Pursuant to Code of Civil Procedure §340.1(q) as amended by Assembly Bill 218, effective January 1, 2020, there is a three (3) year window in which all civil claims of childhood sexual assault are revived if they have not been litigated to finality. This provision provides that, "[n]otwithstanding any other provision of law, any claim for damages described in paragraphs (1) through (3), inclusive, of subdivision (a) that has not been litigated to finality and that would otherwise be barred as of January 1, 2020, because the applicable statute of limitations, claim presentation deadline, or any other time limit had expired, is revived, and these claims may be commenced within three years of January 1, 2020. A plaintiff shall have the later of the three-year time period under this subdivision or the time period under subdivision (a) as amended by the act that added this subdivision." This claim has not been previously litigated to finality; thus, it is timely under the revised provisions of Code of Civil Procedure §340.l(q).

7. This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and,

therefore, they form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Additionally, the "nerve centers" of the International Churches of Christ, Inc., and The International Christian Church, Inc. are both within the jurisdictional boundaries of the Central District of California.

<u>**THE PARTIES**</u>

**A.    <u>PLAINTIFFS</u>**

9.      Plaintiff Anthony M. Stowers ("Plaintiff Andy" or "Andy") is a citizen and resident of New York. Andy was a minor, citizen of the United States of America, and resident of the State of California at the time that he first became a victim and survivor of Defendants' sexual abuse and trafficking.

10.     Plaintiff Erin Tomlinson ("Plaintiff Erin" or "Erin") is a citizen and resident of Illinois. Erin was a minor, citizen of the United States of America, and resident of the State of California at the time that Erin first became a victim and survivor of Defendants' sexual abuse and trafficking.

**B.    <u>DEFENDANTS</u>**

11.     Defendant International Churches of Christ, Inc. (the "ICOC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. The ICOC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. The ICOC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

12.     Defendant The International Christian Church, Inc. ("ICC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of

California. ICC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. ICC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

13.     Defendant HOPE worldwide ("HOPE") was founded in 1994 by the ICOC and is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business registered with the Secretary of State for the State of California located at 9449 Balboa Ave. Ste. 311, San Diego, California 92117. HOPE purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. On information and belief, HOPE is an agent, subsidiary, and/or alter ego of the ICOC.

14.     Defendant MERCYWorldwide ("MERCY") was founded in 2009 by the ICC as a domestic nonprofit corporation and registered with the California Secretary of State as a California corporation. Both the ICC and MERCY listed its principal address at the same address: 2305 30th Street, Santa Monica, California. MERCY purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. MERCY is partially owned by ICC and the principal source of funding for all administrative costs is the ICC.

15.     Defendant City of Angels - International Christian Church ("City of Angels") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. City of Angels purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. City of Angels has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

16.     Defendant Thomas "Kip" McKean ("Kip" or "McKean"), upon information and belief, is a United States citizen, currently residing in Pacific Palisades, California. At all times relevant to the events that form the basis of this Complaint, Defendant Kip was a member of ICOC's Los Angeles regional branch, and later, the City of Angels International Church of Christ in Los Angeles, California. Defendant Kip resided in California for extended periods while conducting business in California on behalf of Defendant ICOC and Defendant ICC.  Defendant Kip's supervision, direction, and control over the  Defendants forms the basis of his personal liability.

17.     Defendant The Estate of Charles "Chuck" Lucas ("Chuck" or "Lucas"), upon information and belief,   was a citizen of the United States of America and was residing, at the time of his death, in Thomasville, Georgia. At all times relevant to the events that form the basis of this Complaint, Defendant Chuck was a member of the ICOC, and later, formed another church called Cornerstone. Defendant Chuck resided in Georgia for extended periods while conducting business in California on behalf of Defendant ICOC.  Defendant Chuck's supervision, direction, and control over the  Defendants forms the basis of his personal liability.

18.     Defendant Crossway Church ("Crossway" or "Crossway Church") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Florida. Crossway purposefully conducts substantial religious and affiliated programs and activities in the State of Florida. Crossway has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

19.     Defendant Cornerstone Church of Christ ("Cornerstone" or "Cornerstone Church") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Georgia. Crossway purposefully conducts substantial religious and affiliated programs and activities in the State of Georgia. Cornerstone has ecclesiastical,

governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

20.     Defendant The Chicago Church of Christ (the "Chicago Church") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Illinois. Crossway purposefully conducts substantial religious and affiliated programs and activities in the State of Illinois. The Chicago Church has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

21.     Plaintiffs are ignorant of the true names of the defendants sued herein as Does 1-10, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend the Complaint to allege their true names when ascertained.  Plaintiffs allege that, at all relevant times herein, Does 1-10 were the co-conspirators, subsidiaries, employees, employers, and agents of constituent members of Defendants herein. Plaintiffs allege that each of the fictitiously named defendants is legally responsible for the actions forming the basis of this Complaint and that Plaintiffs' losses and damages are the result of their wrongful conduct.

## **GENERAL ALLEGATIONS**[1]

**A.     Kip McKean and His Core Leadership Team Spawned a Tightly Woven Network of Cult-Like Churches.**

22.     In 1979, Kip McKean officially broke off from the traditional Church of Christ—the proto-organization that helped spawn the ICOC.

23.     Around that time in Boston, McKean founded what would become the ICOC

---

[1] For the convenience of the reader, these general allegations are common to the pleadings in each of the following related cases before the Court: 22-cv-09467, 22-cv-09472, 23-cv-0064, 23-cv-00765, 23-cv-00999, and 23-cv-01192.

under the moniker of the "Boston Movement." McKean founded the Boston Movement with 29 other members, who seceded from the Church of Christ based out of Gainesville, Florida. The fledgling "church" quickly grew, rabidly seeking out new members and enjoying considerable expansion and success. After the Boston Movement obtained religious recognition in the 1980s, it became the ICOC and grew into a multinational movement.

24.     Over time, the ICOC morphed into an intricate and intentionally confusing "network of over 700 non-denominational churches in about 150 countries." Throughout its history, the ICOC has gone by other names, including the Boston Movement, the Discipling Movement, the Crossroads Movement, and Multiplying Ministries.  Local ICOC churches or assemblies would often append the name of their city, in which they were located, to their name, *e.g.*, the Milwaukee Church of Christ or the Sarajevo Church of Christ.

25.     An ICOC umbrella organization was formally incorporated in California in December 1994. Its Articles of Incorporation filed with the California Secretary of State stated that upon dissolution, "the remaining assets of this Corporation shall be distributed to . . . the individual congregations that are part of the worldwide fellowship of churches of Christ (which are affiliated with the Corporation), if they qualify as distributes under the provisions of this Section."

26.     Chuck Lucas, one of the original founding ministers with Kip in Florida, was eventually paid off to leave the group because of his deviant behavior. Early on, the ICOC and McKean strategically downplayed Lucas's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough, those "recurring sins" were never investigated by ICOC. McKean and other ICOC leaders were acutely aware of Lucas's disturbing pattern of abuse, but nevertheless, they actively concealed Lucas's misdeeds to avert discovery by the police or church members. Covering up for Lucas became the blueprint for the ICOC moving forward, integrating coverups and concealment into its organizational DNA.

27.     In 2006, McKean spun off a derivative church, dubbed the International Christian Church (or "the ICC"), after he was forced out of the ICOC.  The ICC was registered in California as a nonprofit religious corporation in October 2006.  As of

December 2022, the ICC listed 104 affiliate churches on its website.  Its Articles of Incorporation, filed with the California Secretary of State, included references to affiliates. One part stated that upon dissolution of ICC, "the assets of this Corporation shall be distributed to other nonprofit funds, foundations or corporations affiliated with the International Christian Church.[23]

**B.     The ICOC Meticulously Crafted an Enterprise That Enabled, Encouraged, and Concealed Sexual and Psychological Abuse.**

28.     Under the direction and control of McKean, the ICOC (and, later, the ICC) has collectively exploited everything good and noble in their trusting and loyal members by callously robbing them of their childhood innocence through psychological coercion and manipulation, pervasive sexual abuse of children as young as three years old, and shameful financial abuse. Each of the foregoing abuses was actively concealed by ICOC and its members to avert discovery by child protective services and the police.

29.     The ICOC was born out of a "discipling" movement that arose among the Churches of Christ during the 1970s.  The ICOC has maintained this practice into present times. It is a strict practice involving a "discipleship hierarchy" centered around a formal discipleship tree—in other words, a top-down authoritarian hierarchy.

30.     McKean co-designed the specific discipling pyramid that would later become the foundational structure of both the ICOC and the ICC as organizations.  That pyramid structure served as the mechanism of control and coercion frequently exerted over their

---

[2] Between April 2020 and February 2021, eighteen branches of the ICC received Paycheck Protection Program (PPP) loans. These loans totaled $287,490, and a total of $290,040 was forgiven, including accrued interest.

[3] Churches associated with the ICOC appeared to be incorporated into separate entities, according to a review of public records. For instance, the Los Angeles International Church (LAICC), the largest ICOC church by membership, was incorporated in California in December 1990, according to corporate records with the California Secretary of State. The Los Angeles International Church (LAICC) described its structure on its website, noting that it is "organized into eight self-supported regions."  "Each regional evangelist has been given the charge of equipping the brothers and sisters in his part of the LA church (region) to effectively evangelize his area with the saving message of Jesus Christ as well as helping one another mature in Christ."  Notably, "each region has a regional financial advisory group that assists the ministry staff and the Board of Directors with the oversight of the finances in their particular region."

members.[4]

31.     Pursuant to that strict and documented discipleship pyramid, every member has an elder disciple preside over them, who acts as quasi-mentor-qua-jailor.

32.     This carefully crafted "discipleship tree" was nothing short of a sophisticated scheme, deeply rooted in psychological manipulation, accomplished by institutionally normalizing the use of aggressive, abusive, and coercive tactics that brainwash members into fearing the loss of salvation for menial transgressions. It allowed the ICOC and ICC to execute and maintain considerable control over every aspect of every member's life. Members became systematically deindividualized, only to endure communal isolation from the world at large.

33.     Only those members named as "disciplers" were allowed to provide any counseling to church members.  Abuses were reported only to the "disciplers." ICOC church members and leadership discouraged reporting those abuses to outside authorities by routinely branding abuse victims as "disobedient" and blaming them for the abuse they suffered.  Many incidents, which could have reported, therefore never were.

34.     McKean and the ICOC created a religious practice that required victims to confess their "sins" daily.  "Disciplers" would then share the specifics of those "sins" with other groups and leaders to reinforce their control over the victim. This pattern of practice allowed McKean and the ICOC to leverage the abuse as emotional blackmail within the community.

35.     An illustration of the ICOC's hierarchical model of authority is depicted below:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[4] Flavlil R Yeakley Jr. documented the "disciplining" movement in a book titled *The Discipling Dilemma*.  The ICOC and ICC have been classified as toxic, destructive cults due to their rigid and pervasive culture of fear, coercion, control, manipulation, judgment, exclusion, and punishment, along with their overt focus on membership growth (to drive income from tithing).

The ICC had a complex and highly hierarchical organizational structure, unusually so for a relatively new and small religious group. There are many layers of leadership, similar to a pyramid or the Roman Catholic Church.



The ICC has a pyramid-shaped, hierarchical structure of authority. At the top was Kip McKean, the *World Missions Evangelist*, and his wife Elena Garcia-McKean, who served as *Women's Ministry Leader* for the group as a whole. As of November of 2002, the Mckeans

## C.   As Designed by McKean, the ICOC Systematically Indoctrinates, Brainwashes, and Manipulates Its Members.

36.    Initially, new recruits receive profound amounts of "love bombing" to lure them into a false sense of security, thereby allowing sexual predators to effectively manipulate them and eventually abuse them with the comfort of knowing that these vulnerable and newly brainwashed people would never report the abuse.

37.    Every new member undergoes a rigid conversion process tantamount to systemic brainwashing, called the "First Principles."  Once a new member agrees to all indoctrination related teachings, the neophyte must be baptized in water and commit to devote their entire life and schedule to the church.

38.    The ICOC trains each new member to understand that "compliance was the path of least resistance."  Members genuinely and wholeheartedly believed that they needed

1  to follow the Bible verbatim, and that the ICOC's leadership were the only "true" modern-

2  day disciples on Earth.

3       39.    In addition to the "discipler" structure, the ICOC indoctrinated its members

4  with rigid fundamentalist teachings, demanded unyielding compliance with its instruction,

5  and enforced strict social separation.

6       40.    The "discipler" hierarchy facilitated McKean and the ICOC's systemic

7  concealment of abuse, created a culture of fear among its most vulnerable, and allowed

8  predators to abuse women and children with impunity.  Their practice of concealment

9  became an institutionalized pattern within the ICOC.  For example:

10           a.    On information and belief, one ICOC member currently owns a school

11  for autistic children in the San Francisco area.  He has been accused of multiple instances of

12  sexual abuse of adults and children/teenagers while he was in Boston. ICOC and McKean

13  were aware of this despicable man's repeated abuse, but McKean orchestrated his relocation

14  from Boston to San Francisco to conceal his predatory practices and avert criminal

15  prosecution.

16           b.    On information and belief, non-parties Damon and Vicki James, two

17  ICC "disciplers" working under the specific direction of McKean, instructed a member on

18  July 1, 2018, to refrain from reporting two years of physical and sexual abuse by her

19  husband. Damon James even scolded this survivor and stated, "[w]e don't do that to our

20  brothers as disciples."  Vicki James then victim shamed the woman by stating "[w]hy would

21  you have the heart to press charges?" Damon continued and told the woman, "[w]hat does

22  that gain? That puts you in front of 'the world'."

23           c.    Former ICOC member Carter Whitten made the following harrowing

24  statement to an ICOC whisteblower regarding the abuse he endured in connection with his

25  "discipler" experience:

26                "For  reasons  I  still  don't  fully  understand,  my

27                'discipler' met with me and two other teen boys at one

28                of the boys' houses. In the basement we sat in a circle,

and the goal of my discipler was to break me down and to get me to fully understand the horrors of Hell: Meaning what I had to look forward to if I didn't enter the Kingdom (the ICOC) before I died. So next he took it upon himself to paint a vivid picture for me: My discipler described a scene in hell in which I was nailed to a ceiling by my PENIS and spun around by a demon. Hanging only by my genitals, I was forced to watch the devil RAPE my mother repeatedly for all eternity. I was then asked to take that grotesque vignette and multiply its terror by 10,000 (or some other arbitrarily large number) to catch even a glimpse of how utterly horrifying the future awaiting me was, unless I was to get baptized and be saved. I finally broke down and cried. Which was clearly the goal, as the ICOC famously conducted what they called "breaking sessions."

In addition to completing their entire conversion series of Bible studies, there were even more hurdles I was told I had to clear in order to become a baptized disciple. One is that I had to call the fathers of all the girls in the teen ministry to whom I was sexually attracted, confess my sins of lust after their daughters, and ask for the fathers' forgiveness. I was mortified. I then asked another teen boy—a good friend of mine, if he had been made to do the same thing before he got baptized. He revealed he had indeed been told to do so,

and was terrified by the whole ordeal and shunned by most of those fathers.

The final step was the sin letter or sin list. All disciples-in-training (those studying the Bible) were expected to write an exhaustive letter to God, documenting every single sin they had ever committed in their entire lives and asking for forgiveness. The letter was usually meant to be read aloud in a group setting. I was only 14.

I must have been twelve or thirteen when I realized that almost every conversation or sermon in the teen ministry was talking about lust and masturbation and sexual sin on some level. So now looking back as an adult, I am horrified by how perverse and abusive this culture was. Like many evangelical denominations, the ICOC indulged in purity culture and thus placed a heavy emphasis on sexual purity.

But the ICOC took it to a whole new level, the way that adults dealt with teens in these ministries—children that were not their children—seems criminal to me. At the very least, it was a gross and egregious abuse of the power dynamic between adults and children. And I know enough people across the country in the ICOC to know that this was not an isolated incident, it was literally happening in every 'teen ministry.'

But even worse than this, I had a friend that was physically assaulted while he was studying the Bible, because he tried to get up and leave. So the teen leader held him down and beat him up.

We had to meet in one-on-one and group D-times, where we had to confess our sins (especially sexual sins) in a group setting, and the disciplers (teen leaders) would sometimes confess sins as well. During one such meeting, an adult discipler confessed to a group of four or five boys that he had had a wet dream (nocturnal emission) that week, and in many other meetings we were told by disciplers that masturbation equated to "ejaculating on the cross." I never understood why grown men were spending so much time with boys as young as 12 and 13 confessing all their sexual sins to them… I heard things I had never heard before, and it all felt very abusive and inappropriate to me, even as a child.

Why were grown adults grilling other people's teenagers for specific sexual details . . . When most of these teens had never even had a sexual experience in their life. The abuse of power here and power dynamics were so damaging to most of these teens in the teen ministry, that the PTSD and anxiety and therapy that most of these children have needed their whole lives is astounding."

**D.     McKean Structured the ICOC to Maintain Secrecy.**

41.     McKean's carefully crafted church hierarchy lent itself to maintaining secrecy and preventing outside intervention. The following diagram is a rough depiction of the church's organizational structure:



42.     Among other goals, McKean purposefully structured the ICOC's hierarchy to ensure that abuse within the church remained a secret to all outsiders, including the authorities. Indeed, someone within the church was always monitoring lower ranking members and giving them explicit instructions on how to conduct themselves.

43.     McKean and the ICOC's leadership taught, and continue to teach, the doctrine that only fellow church members are "true disciples" of Jesus who will be rewarded with a place in heaven in the afterlife.  Conversely, non-members will not go to heaven because they are not "true disciples." That doctrine engendered an insider-outsider mindset, which allowed scores of sexual predators within the churches to abuse children without fear of criminal prosecution.

44.     The ICOC also created a highly exclusive environment for its members wherein they were/are prohibited from marrying anyone outside the church.  The ICOC must approve all marriages, which ultimately gives it an incredible degree of control—and

1  power—over each of its members.

2       45.     Questioning higher ranking members or the church in any manner invited

3  damning ostracization. Sometimes, the ICOC would labels those individuals as

4  "disfellowshipped" or "marked" for being divisive. "Disfellowshipped" meant

5  excommunication.  Being disfellowshipped or marked would lead to ostracization and scorn

6  from the ICOC's communities. From the point of view of ICOC doctrine, being labeled as

7  "disfellowshipped" or "marked" equated to being condemned to hell on earth and in the

8  afterlife, too.  Indeed, that communal ostracization and isolation from the outside world

9  inflicted highly debilitating emotional and mental harm to many of their members and, in

10 some cases, drove them to suicide.

11      46.     But when it came time to judge known or suspected abusers, the ICOC

12 demanded that its parishioners forgive any slight, no matter how severe, and "move on"

13 without reporting such abuses. Judging the conduct of another, no matter how villainous,

14 was beyond the right of any individual, according to McKean and others, because "no one is

15 free from sin," unless they are male members of the ICOC.

16      47.     Because of the ICOC's strict rules, the expanse of its control over its

17 members' lives, and the severe consequences it could impose on members who questioned

18 its teachings (let alone transgressed its instructions), the ICOC created the ideal conditions

19 for child molesters, pedophiles, and other sexual abusers to fester and thrive.  Furthermore,

20 McKean and other abusers expressly leveraged the ICOC's hierarchical system of authority

21 to insulate predatory church leaders from exposure. Many of those predators continue to

22 prey upon children without fear of repercussion.

23      48.     It is commonly understood that McKean was acutely aware of the physical,

24 psychological, and sexual abuses that church leaders (like Chuck Lucas and others) wrought

25 upon both children and adult parishioners of the church. Academic writings, journals,

26 recovered correspondence, newspaper articles, eyewitness accounts, and publications like

27 the book Toxic Christianity—written by former ICOC leading members under the collective

28

pseudonym "Mr. X"[5]—corroborate that fact. These are but a fraction of the litany of sources of information depicting the practices and abuses that the ICOC institutionalized to the point of normalcy within the church.

49.     To ensure that the ICOC's exploitative conduct remain unchecked, McKean, the ICOC, and its leadership have utilized their vast resources to silence any internal dissidents, including through vexatious litigation. The ICOC has created a "David and Goliath" scenario, swiftly suppressing the few members who have spoken up over the last four decades. The ICOC would use its vast resources to silence any internal dissidents, through coercive, deceptive, and threatening tactics to not only force members to give 10 to 40% of their income every month, but also to turn over student loans, IRS tax returns, children's college funds, heirlooms, stocks, furniture, wedding rings, cars, prized possessions, and literally anything that the ICOC could get their hands on. The ICOC grew its resources from nonstop fundraisers, forcing members to put their "special contribution" amounts of thousands of dollars on credit cards, or borrowing it from outside family members.

50.     When many abused victims escaped the ICOC, they were so financially destitute (and emotionally devastated) that they lacked both the financial resources and emotional resilience to take on the ICOC through legal recourse. The ICOC used this to their advantage, as it would help silence any word of sexual abuse.  In short, McKean and the ICOC intentionally created a system of exploitation that extracts all the financial value it can from its members, which it could deploy to further shield their illicit conduct from discovery by outsiders.

51.     The ICOC and its leaders have cajoled, manipulated, and even coerced parents and other church members to remain silent about the abuses that their children suffered, such as through payoffs and non-disclosure agreements.  The ICOC's affiliate organizations

---

[5] It is widely believed that Rick Bauer, a former ICOC member and whistleblower, co-published with another church leader under the pseudonym "Mr. X" and can be accessed in its entirety here: http://www.reveal.org/library/theology/Toxic.pdf

(*e.g.*, its non-profit arm, HOPE Worldwide) also helped insulated abusers from accountability by lending legitimacy to the ICOC's system of exploitation and abuse.

**E.      McKean Grew the ICOC's Ranks to Feed Its Financial Operation.**

52.      McKean and other ICOC leaders were obsessed with growing church membership because more members meant more revenue from income tithing and other coerced, uncompensated labor from adults and minors.

53.      Accordingly, they imposed recruiting quotas on members to help grow their ranks.  The ICOC requires all its members to recruit a certain number of new members on regular intervals, as well as to bring visitors to all church events. Tolerating, concealing, and hiding sexual abusers (while at the same time inviting more abusers into the ICOC's ranks) simply became a cost of doing business.

54.      To incentivize bringing new members into the fold, the ICOC cultivated an atmosphere that isolated its members from other social networks, while concealing the systemic abuse of women and children within the church. Members spent every day together; they were not allowed much, if any, contact with family members or friends who were not church members. Of course, the only exception to that strict rule was contact with outsiders for the sole purpose of their recruitment.

55.      Members were required to give at least 10-30% of their income to the churches *before* they were allowed to be baptized and become an official member.

56.      Thereafter, any member's position, health, and wellbeing in an ICOC church community depended heavily upon success in expanding the congregational rosters. Those social incentives created a self-perpetuating business model to attract new recruits/members, and in doing so, generate hundreds of millions of dollars in revenue for the church through new tithing.

57.      Also, the ICOC forced its members to participate in special contributions for missions approximately twice a year equaling approximately 40 times their normal tithe amount. The ICOC was relentless in its pursuit for funding and church leadership would resort to interrogating members about their income, going so far as to demand copies of the

members' paystubs. By way of example, if a member gave $4,000 per month, the total mission contributions for that year would equal an additional (40x) and the total required sum would be $160,000 in addition to the normal yearly tithe amount of $48,000. This particular member would be required to give the church a whopping total of $208,000 for the year.

58.     Children were also asked to contribute, including their labor for events like car washes or baby-sitting.

59.     On information and belief, the ICOC has collected upwards of $10 to $15 billion in tax free contributions over the past four decades.

60.     If the tithing budget was not satisfied, the ICOC forced its leaders or "disciplers" to contribute the financial shortfall themselves.  Examples of the ICOC's pattern of coercive tactics to enforce non-consensual tithing include, but are not limited to, the following:

        a.     The ICOC put members, who failed to tithe, on a "weak and struggling list," a list which was known to all ICOC leaders.  If the "weak and struggling" member did not eventually repent and repay the tithe, the ICOC "disfellowshipped" him or her.

        b.     The ICOC would ask its members to locate members who failed to tithe and peer pressure them into tithing, for example, by sitting on their porch and waiting until they arrived home to collect the money.

        c.     In 2005, two former ICOC members filed a suit in Tennessee claiming the church uses cultlike tactics, manipulation, peer pressure and guilt to force members into tithing and making other financial contributions.  They alleged that for personal gain, "the Nashville Church, the [ICOC], Hope Worldwide, and Central and South America World Sector jointly participated in a scheme to defraud church members, who are not allowed to inspect the church's financial records."

        d.     A former member (who only wishes to go by Tina C.) witnessed Non-Disclosure Agreements being forced upon parishioners, claiming that they could never talk about the true finances of the Defendants despite evidence that ICOC opened offshore

accounts containing massive quantities of cash.[6]

61.    The pressure to comply with the church's rigid demands became a source of anxiety and depression for many members—so much so that several ex-members committed suicide.

62.    In furtherance of efforts to protect the church and its primary source of revenue (*i.e.*, its members) at all costs, McKean and the ICOC used psychological manipulation to conceal the incidents of abuse.   ICOC members routinely read scripture to discourage "dragging brothers into court."   For example, McKean told members of the ICOC, including the mother of Jane Roe 8, that:

> "We cannot report these abuses, because it would hurt our church, which is God's Modern-Day Movement."

> "Do you want the fall of God's modern-day movement on your head???!!"

> "The cause of protecting God's Kingdom on earth is more important than the sin or the pain of a few individuals."

> "We need to forgive our brothers who sin and realize that they are a new creation in Christ, and give them a chance to make things right. If we report them, it will destroy their lives and hurt the church."

63.    In addition, the ICOC engaged in strategic victim blaming and victim shaming. For example, ICOC leaders blame victims for bringing on their suffering because their clothing was too provocative, they were supposedly disobedient, or that they did not listen to the ICOC's advice.

64.    Through this combination of tithing, labor contributions, and concealment of

---

[6] Top leaders of the ICOC put "different ICOC assets and properties in their names" in order shelter and hide those assets "so that the church didn't specifically own them." For example, The Bay Area Christian Church listed its address at the location of the HOPE Technology School for Autistic Children, which was owned by Bay Area Christian Church executive minister Russ Ewell. As of 2022, the property had a total assessed value of $7.7 million, all of which was exempt from taxes under an "other" exemption.  The Bay Area Christian Church also received a PPP loan of $764,600 in April 2020.

crimes through fear, coercion, and manipulation, McKean and the ICOC managed to operate a highly profitable pyramid scheme.

65.   A web of paper corporations and alter ego 501(c)(3) entities supported that pyramid scheme, culminating in hundreds of millions of dollars in illicit gains. The full extent of the ICOC (and the ICC's) profiteering is unknown, especially in view of the tithing and labor contributions that the ICOC and the ICC routinely coerce from their members.

66.   Plaintiffs are aware that the ICOC and the ICC have also benefitted from millions in governmental support through SBA loans, authorized under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).[7]  Through their abuse of the corporate form and systematic exploitation of their members, the ICOC and the ICC have created literal cash cows built upon layers of lies and deceit.

67.   McKean actively solicited church members to turn over their COVID-19 relief money to the church. The following are excerpts of emails from McKean to various church elders and leaders:

**Here are my charges for the USA Churches:**

1. Call your members to give their stimulus checks ASAP. Americans are known to spend everything in their accounts. The great Chicago Church has called these $1,200 checks "Manna from Heaven!"

Presently, all around the world, if a member misses 2 or 3 weeks – usually recognized by missing 2 or 3 weeks of weekly contribution – this is a red flag that they may have become unfaithful. (There of course are always exceptions.) It is a fact that almost every USA Disciple has the ability to give online. So discipling in the COVID-19 Era must include how to give one's weekly contribution online.

Therefore, in the COVID-19 Era to show more forbearance and grace, if a person on your membership has not given for 4 straight weeks – remember this is the USA Churches not third world like India, the Philippines, Africa and some nations of Central and South America – then we must have the conviction that they have become unfaithful to God. At this point, after consulting your World Sector Leader then a decision needs to be made concerning the removal of their name from your membership. However, before that is done, the Evangelist or Women's Ministry Leader must contact them to see if there are extenuating circumstances. Take each situation on a case by case basis.

---

[7] During the COVID-19 pandemic, branches of ICOC received 77 Paycheck Protection Program (PPP) loans, totaling over $9.4 million. Over $9.2 million of those loans were forgiven, including accrued interest. *See* https://projects.propublica.org/coronavirus/bailouts/ for more information.

68.     HOPE, a sham charity organization, is one example of a tax-exempt corporation under the ICOC's and the ICC's corporate umbrellas.  HOPE has generated over $100 million in revenue over the last six years.  It continues to generate a substantial share of its tax-free revenue from its members using substantially similar methods of the ICOC and the ICC, which are characterized by the tax-deductible contributions from third-party corporations and high-net-worth individuals.

**F.     McKean and His Churches Used Children's Ministries to Extend the Abuse Enterprise.**

69.     The ICOC's children's ministry, named the "Kids Kingdom," further insinuated the ICOC into the lives of its members and their children.

70.     The ICOC built a culture of child grooming.  Children were taught from a very young age to "obey" their ICOC elders or face corporal punishment.  The ICOC indoctrinated the children under its control to therefore obey adults and authority figures unquestioningly.

71.     Those policies, practices, and norms allowed the ICOC and its Kids Kingdom, in particular, to become fertile grounds for sexual predators.  Countless instances of abuse happened within the Kids Kingdom ministries themselves, during its hosted mission trips (*e.g.*, HOPE Worldwide trips), and other related religious and social events.

72.     HOPE took teenagers on mission trips around the world to spread God's Word. Many of these children thought they were participating in an evangelical trip.  Ultimately, many, including some of the Plaintiffs, were sexually abused by vile adult men. Children and/or their parents reported the sexual abuse, including rape, to elders and doctors (*i.e.*, mandated reporters) within the church, but the church never bothered notifying the police of the illegal activity. There were no instances of any ICOC medical doctors reporting the abuse to anyone, let alone anyone outside the church.

**G.     McKean and His Churches Encouraged Physical Abuse of Children Under the Guise of Discipline.**

73.     In addition to sexual abuse, children in the care of ICOC (and ICC) staff were routinely physically abused under the pretext of "discipline."  The ICOC also instructed the

1  parents to routinely physically abuse their children under the pretext of discipline.

2       74.    Church leadership often recited the following commonly known passage from

3  Proverbs 13:24 as justification for child abuse: "Those who spare the rod of discipline hate

4  their children. Those who love their children care enough to discipline them."

5       75.    For example, the ICOC instructed its members to spank children, including

6  infants, with a wooden paddle or spoon. Pictured is an example of a custom-made ICOC

7  paddle with a heart shaped hole in it. A true and correct image of the heart shaped paddle is

8  depicted below:



25       76.    Members were instructed, with visuals, on how to use corporal punishment

26  without leaving bruises, welts, or red marks, so the offending members could not be reported

27  to child protective services. One former member recalls frequently seeing young children at

church with welts or bruises on their thighs. On one occasion, this member witnessed a child with a "heart shaped welt" on his/her body.

**H.    Defectors are Beginning to Corroborate the Abuses Publicly, and Experts are Taking Note.**

77.    McKean and his team of capable, well-educated henchmen convinced nearly everyone within his churches to remain silent for the last 43 years. That silence has come to an end.

78.    Some ICOC members were fortunate enough to escape the church's tight grasp and successfully flee the toxic and harmful environment that McKean created.

79.    According to some of the most respected cult experts around the world (such as Dr. Steve Hassan, PhD), the ICOC and ICC are some of the most dangerous cults in existence. The danger arises primarily because the church insidiously masquerades as the approachable 'church next-door' with deeply rooted Biblical foundations. On its face, this public image of the church seems innocent.  But the church's internal machinations are characterized by unmitigated systemic and chronic physical and sexual abuse of children and women within the church.

80.    Defectors have since revealed the abuse they suffered or witnessed at the ICOC. For example:

a.    Former member (and non-party) Lisa Johnson was a top leader in New York City and a friend of McKean.  In a podcast called *Eavesdropping*,[8] she made the following comments regarding the ICOC based on her personal experience: "Women [in the ICOC] are getting ground up, and I mean tons of people, it's not an isolated case here and there . . . And I think about these women now, after all these years . . . So I'm gonna bring up something here. . . . There has been sexual abuse, there has been emotional abuse, and there has been some physical abuse of women . . . and part of that is the issue of patriarchy.

---

[8] The podcast may be accessed from YouTube from https://m.youtube.com/watch?v=mqhs4GJ1D-s&pp=ygUsU3RldmVuIGxlc2xpZZSBqb2huc29uIExpc2EgbXkgTGlzYSBhbmQgU2hhcmk%3D.  The statements begin at the 44:40-minute mark and last for about four minutes.

We developed a system and a way that was not safe for women . . . There are women that have been very damaged and ground up by that.  The fruit of this is so obvious, how can you miss it? How many women have been told to stay with their physically abusive husbands and how many women have been sexually abused?"

b.   In a 2022 podcast with Steve Johnson,[9] another ICOC defector, James Lloyd, explained the irony of Lucas's pedophilia with young men when the ICOC had implemented its own a LGBTQ+ conversion therapy ministry:

"The truth is the foundational—what I call—"original sin" of our movement was homosexuality. Man on man.  Specifically, male older leader on young intern . . . Not a few times . . . You can find out, it's not like nobody knows. The fact that our sin, our original sin, was a senior leader [Lucas] who is respected and loved and training a group of young men.  They get in a room and shut door and then this senior leader [Lucas] 'puts the moves' on these young men. And it's worse than it sounds because those men became ministers and went out into their churches and some of them did the same.  And I know that because I was in some of those meetings where it was confessed!

We [the church leadership] thought it was best not to ever share that with everybody, and I heard all the reasons and I bought into them: 'He's got children, you know.' 'He's got children, he's got a wife.' 'You don't just say those things . . . it could hurt the faith of a young Christian.'

All those things are hierarchy saying, that's patriarchy saying, that we don't need to bring this thing up about men on men.  But I'm telling you, one of the

---

[9] The podcast may be accessed from Facebook at https://www.facebook.com/watch/live/?extid=CL-UNK-UNK-UNK-IOS_GK0T-GK1C&mibextid=2Rb1fB&ref=watch_permalink&v=1109647602942209. The statements begin around 29:00-minute into the clip and continues to the 31:30-minute mark.

problems—and one of the reasons why I call it "original sin"—I don't think that that sin is any different than if it had been a man and a woman, by the way, that's not married.  But the fact that we hid it.  You laughed at the word 'transparent.'  That's what we needed. . . We needed to be hearing about that.  People should be taught that that's how things started in our group.  And some of that has continued for three generations. . . . Some of that trauma was carried on, was passed on to other men as those men went out to start their churches. . ."

**I.     The ICOC and the ICC Refused to Report Numerous Pedophiles Who Were Later Arrested.**

81.     At least ten pedophiles have been arrested in connection with abuses linked to the ICOC or ICC. Described below, these individuals committed numerous crimes before the police intervened.  On information and belief, they represent only miniscule fraction of the true number of predators who have operated with impunity within the ICOC since 1979.

**1.     David Saracino**

82.     In January 2012, Defendant David Iburg, *a/k/a* David Saracino ("Saracino"), was sentenced to 40 years of hard labor in the State of Louisiana, the maximum sentence, for the **forcible rape of a 4-year-old girl in 2004**.[10] The prosecutor, Cynthia Guillory, told the judge that he was among the worst of the worst. Saracino purposefully sought out women with financial problems so he could gain access to their small children, who became his victims. He had charges and convictions in Texas, Utah, and Louisiana, where he received the 40-year sentence.[11]

83.     Saracino attended the East Region of the Los Angeles ICOC, where several members (single mothers) of the ICOC reported to the leaders in the East Region in or about

---

[10] *State v. Iburg*, 12-2720 (La. 5/17/13), 118 So.3d 372.

[11] For more information, *see* Theresa Schmidt, *Prosecutor to child rapist: You're the worst of the worst*, KPLC News (Jan. 6, 2012), last accessed June 13, 2023 from https://www.kplctv.com/story/16464797/man-gets-40-years-for-raping-a/?outputType=amp.

1998 that Saracino had continuously molested their daughters. Ultimately, several police reports were filed by the parents, while the ICOC remained silent. Just as the ICOC did nothing to address these reports, Saracino escaped to the San Diego ICOC and freely resided in the Escondido area, temporarily, until fleeing again.

84.     For a time, Saracino disappeared.  He was free to go on a nationwide crime spree, abusing and raping little girls along the way. Saracino was finally caught, but only after an episode of America's Most Wanted produced credible leads that resulted in his capture.

85.     Like so many others, the mothers of the victims were told not to share with anyone else what Saracino had done, as it would "hurt the church."

86.     Had the ICOC assisted in his arrest or alerted their congregations, Saracino could not have continued abusing children with reckless abandon.  On information and belief, the ICOC intentionally, willfully, maliciously, and recklessly knew of his proclivities without warning parents, concealed his whereabouts, and enabled his escape from authorities.

**2.     Waldo Milla-Guerra**

87.     In or about February 2018, a volunteer soccer coach named Waldo Milla-Guerra of Middlesex County, New Jersey, was arrested on charges of possession and distribution of child pornography.  Milla-Guerra volunteered at the South Brunswick Soccer Club and formerly taught at Kid's Kingdom at Central Jersey Church of Christ in North Brunswick.

**3.     Benjamin Samuel Speights**

88.     In 2005, Benjamin Samuel Speights, a member of the south region Los Angeles ICOC, was convicted for lewd and lascivious acts against a child under the age of 15.

89.     Speights' unlawful conduct included forceable participation of a 14-year-old girl to create pornographic videos that he sold.

90.     In December 2020, Speights was convicted in Arizona in connection with a Class 2 felony of sexual exploitation of a minor as part of a negotiated plea deal related to child pornography charges.  Speights was a leader in the "Kid's Kingdom" ministry in the El Segundo South Region of the Los Angeles ICOC church.  Several children at this ministry

1  reported his physical abuse, but neither the ICOC nor its ever reported the abuse that those
2  children endured or attempted to prevent future abuses.

3  **4.    Nicholas Griffin Lombardi**

4      91.    Nicholas Griffin Lombardi is another example of a known pedophile abusing
5  children within the ICOC's churches. He was a long-standing member of the ICOC, as were
6  his parents.

7      92.    On or about November 27, 2022, Lombardi posted on his personal Facebook
8  page "I kind of have a fantasy of fucking a child ha[.]"

9      93.    Lombardi was convicted for lewd and lascivious acts against a child under the
10 age 15. In addition, there are numerous accusations of abuse against Lombardi.  And yet, the
11 ICOC refused to report his abusive conduct to the authorities.

12 **5.    William (Bill) Thomas McLaughlin**

13     94.    In approximately August 2011, one ICOC abuser, William (Bill) Thomas
14 McLaughlin, was sentenced to 6 years to life, followed by 10 years to life of parole for various
15 counts of felony sexual assault on a child by a person in a position of trust.[12] He abused
16 approximately ten to fifteen individuals, all of whom were expelled or in some fashion pushed
17 out of the Denver ICOC as punishment for failing to comply with the leaders' commands.

18 **6.    Tomotaka Andrews Wilton**

19     95.    Tomotaka ("Tom") Andrews Wilton of the Portland, Oregon ICC location
20 raped a child for years. [13]

21     96.    Church leaders, including McKean, were acutely aware of the abuse but did
22 nothing to warn anyone regarding this despicable predator's presence.

23     97.    In 2009, he was convicted in Idaho of two counts of third-degree rape of a child

24

25

---

26 [12] For more information, *see* Rhonda Moore, "Denver man sentenced in Douglas County for sex assault on child" *Castle Rock News-Press* (Aug. 16, 2011), last accessed June 13, 2023 from https://castlerocknewspress.net/stories/denver-man-sentenced-in-douglas-county-for-sex-assault-on-child,117951.

27 [13] For more information, *see* the Idaho State Police offender profile, last accessed June 13, 2023 from:
28 http://www.isp.idaho.gov/sor_id/SOR?id=35071&sz=1360; https://www.homefacts.com/offender-detail/IDSX35071/Tomotaka-Andrews-Wilton.html.

and is now a registered sex offender. On information and belief, Wilton remains a member of the Portland ICC.

**7.      Karim Torres**

98.      Karim Torres was convicted of indecency with a child by contact.

99.      On information and belief, he is currently a registered sex offender.

100.      On information and belief, he serves as a Bible talk leader at several Texas ICOC locations. He and his wife are known to frequently visit other ICOC churches as speakers at family retreats.

**8.      Warren Inman**

101.      Warren Inman was convicted of at least three counts of indecency with a child in or about February 2021 in Denton County, Texas, Case No. F-2012-0728-D. He was a member of the Dallas ICOC and lives in Denton County.

102.      He was a worship leader and allowed college students to live in his home, as he regularly had college worship group meetings at his home. Inman has been in and out of prison and was finally arrested for child molestation. On information and belief, the ICOC neglected to report him to the police.

## SPECIFIC ALLEGATIONS

**A.      The Sordid History of Chuck Lucas**

103.       When Chuck Lucas became involved with the ICOC, he was a licensed psychologist at the time.

104.      It is commonly understood that McKean, was acutely aware of, the physical, psychological, and sexual abuses Lucas and other church members wrought upon children and adult parishioners.  ICOC and McKean strategically downplayed Chuck's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough, these "recurring sins" were never investigated by ICOC.[14]

105.      After Lucas was paid off to leave the ICOC due to his deviant behavior, he led

---

[14] Ryan Britt, *History Repeats Itself: The Rise and Fall of Kip McKean & Chuck Lucas*.  Last accessed on December 29, 2022 from: http://www.reveal.org/library/history/britt2.html.

1   CrossRoads Church of Christ in Gainesville, Florida.

2       106.   Lucas died in August 2018.   However, Plaintiffs and scores of members

3   witnessed his ongoing abuse of children and adults within the congregation through the end

4   of his despicable life.   Sam Laing, one of Lucas's continued faithful supporters and a

5   prominent lead evangelist with ICOC, was aware of Lucas's deeply disturbing abuses and its

6   chronology. Sam Laing recently made a statement about Chuck in a 2018 article published in

7   "Disciples Today," which is an ICOC owned platform/news source: ""Chuck Lucas was a

8   man of deep conviction. He was a disciple of great courage and perseverance. He was

9   criticized, persecuted and attacked for what he stood for, but he never quit. Yes, he had his

10  weaknesses and failures along the way, but he, by grace, repented and overcame them, and

11  was restored."[15]

12  **B.      The Torture and Sexual Abuse of Plaintiff Anthony Stowers**

13      107.   Plaintiff Anthony Stowers ("Anthony"), a transgender man, was born in Florida

14  in 1993 and currently resides in New York. At birth, Anthony was named Emily Rebekah

15  Stowers. On or about the fall of 2016, he changed his name from Emily to Anthony and began

16  transitioning.

17      108.   Anthony's uncle is Kris Stowers, an orthopedic surgeon, an ICOC church leader

18  and evangelist of the Crossway ICOC. Anthony's father is Randal Stowers, who is Kris's

19  brother. During his childhood, Anthony visited the home of Kris and his wife, Alison, quite

20  often.

21      109.   In approximately 1986, Kris Stowers followed Chuck and Ann Lucas to help

22  build what was called Cornerstone Church with Lucas. Kris Stowers stayed there until

23  approximately 2005 when he left Cornerstone Church (formed by Chuck Lucas after he was

24  forced out of ICOC) and joined a group that formed the new Crossway Church. Crossway was

25  and remains an ICOC affiliate, although the congregation claims otherwise, presumably to

26  shield itself from ICOC's sordid past.

27  _____

28  [15] Sam Laing, *Chuck Lucas: A Servant of God* (2018). Last accessed on December 29, 2022 from:
    https://www.dtodayarchive2.org/chuck-lucas-gods-servant-and-how-he-used-him

110.   To minimize and to cover up Lucas' conduct that led to his ouster from ICOC, Kip McKean and the ICOC leadership publicly claimed that Lucas was forced out because of "recurring sins, " but there was zero public mention of the rampant sexual abuse. In furtherance of the cover up, the ICOC leadership never reported Chuck Lucas' abuse to law enforcement.

111.   Throughout his childhood, Anthony was systematically and intentionally indoctrinated by ICOC to believe that: only members of ICOC were to be trusted; he must comply with any requests he received from adults; all medical treatment should occur within the ICOC by its members; and any reports to the authorities, including Child Protective Services, would result in Anthony being taken into foster care custody where he would be raped daily.

112.   Anthony's time was strictly monitored and he was discouraged from spending time outside of school with anyone other than church friends, as his parents and/or other ICOC leaders thought his school friends had "progressive values." Anthony believes this was because the church did not want anyone influencing him and/or because the church did not want to give him  an opportunity to disclose the abuse to outsiders. The end result was that Anthony constantly felt like he was under constant surveillance and scrutiny.

113.   **Anthony's recalls being molested at the age 3-4 while in the care of the ICOC pre-school, Noah's Ark**. Anthony recalls adult men, who at the time, were leaders and/or members of ICOC were allowed unfettered accessibility to the pre-school, despite not being teachers or otherwise, and as a result Anthony recalls many instances of being taken by Michael Salter to a nearby property, also owned by ICOC where **Anthony endured sexual abuse by Michael Salter and others**.

114.   **Anthony recalls being sexual abused and raped by Chuck Lucas beginning at least by age 3 and continuing for several years. The abuse by Chuck Lucas occurred at Chuck Lucas' residence in Thomasville, Georgia on Remington Avenue, at Cornerstone, at Chuck Lucas' private office, other locations and a hotel.** Anthony also recalls Ann Lucas, Chuck's wife, who also has a psychology degree, manipulating him and

others.

115.    When Andy was approximately between 8 to 12 years old, Peter O'Donnell, an ICOC member oversaw organized equestrian exhibitions at Saddlebrook Farms summer camp, which was run from Peter O'Donnell's home. Peter O'Donnell is a convicted felon, including but not limited to embezzlement.

116.    ICOC church events were also occasionally held at Saddlebrook Farms in Florida. At one of these exhibitions at SaddleBrook Farms when many other children were on site for the event, Peter O'Donnell, beckoned Anthony into his office, where he was sitting, and said, "Come over here," and when Anthony walked over, Peter O'Donnell exposed his erect genitals to Anthony. Anthony was also taken to other church sponsored sporting events where he was fondled and passed around to various adult men.

117.    Unfortunately, Anthony has seen nude pictures of himself, and is also aware of videos of himself taken when he was a child, however, he has no recollection who created the photos and videos.

118.    Andy was also sexually abused by his father, a member of ICOC. The sexual abuse at the hands of his father allowed the ICOC to maintain complete control over every facet of Andy's life. Randal Stowers and Kris Stowers also facilitated other ICOC members and outside men in their horrific sexual abuse of Anthony, including, arrange for transportation to and from various locations.

119.    Anthony was continuously sexually abused by his father, Randal Stowers, a school teacher and a member of ICOC and Kris Stowers' brother. Anthony's first memories of the sexual abuse from his father Randall, occurred when he was 3 years old and continuing thereafter until Anthony left home in his teenage years. Anthony does not recall a time when his father was not abusing him in some fashion. Randal's abuse ranged from grooming, molestation, unwanted and inappropriate touching in front of other people, forced kissing, sexual and emotional manipulation, rape, threatening behavior, and participating, facilitating or allowing the sex trafficking of Anthony.

120.    Anthony attempted to report the abuse within ICOC to counselors and teachers

at his high school where his father Randal worked, but those pleas for help were always squashed for reasons that Anthony does not understand to this day. Shockingly to teenage Anthony, mandated reporters within the ICOC, such as counselors, doctors, and psychologists actively concealed his reports of abuse and took no remedial action.

121.   After enduring a lifetime of brainwashing and extreme psychological manipulation by ICOC, Anthony spent his entire adult life believing that the crimes perpetrated against him were acts in furtherance of God's will. Defendants deliberately coerced Stowers and other ICOC members into believing their suffering was not actual suffering, and if they reported the heinous crimes, they would endure a suffering like nothing they had never experienced before.

122.   Only upon his escape from ICOC in late 2016 did Anthony begin to realize the myriad of emotional and psychological harm he suffered at Defendants' hands.

123.   As a direct and proximate result of Anthony's abuse and cover up by Defendants, Anthony suffered and continues to suffer a litany of injuries. Among other injuries, Anthony has experienced and will continue to experience for the rest of his life include severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**C.    The Torture and Sexual Abuse of Plaintiff Erin Tomlinson**

124.    Erin is a 36-year-old non-binary person who was a member of ICOC's Chicago location and Erin currently resides in Chicago, Illinois.

125.   Erin's parents were members of ICOC and in 1987, the family moved from Oklahoma to Chicago when Erin was one year old.

126.   While living in Chicago, Erin was abused by their father, Eric Tomlinson, who was a respected leader of the Chicago ICOC and served as an occasional teacher in the Kids Kingdom Ministry. Erin's father was initially employed as a social worker and worked with children who were wards of the state of Illinois, including the Mercy Home for Boys and Girls. Consequently, Erin's father was a mandated reporter at all relevant times. Eric Tomlinson

1   later obtained a PhD in psychology.

2       127.   All ICOC members and leaders were forced to confess their sins, temptations

3   and weaknesses on a daily basis, thus, it stands to reason that Eric Tomlinson would have

4   confessed his crimes to other ICOC members, none of which reported the criminal conduct to

5   the authorities.

6       128.   Erin's first memory of being molested by Eric happened approximately at the

7   age of age 4, although Erin suspects the abuse could have begun much earlier, as they have

8   visions and memories, but no cognitive memories until age 4. The abuse was comprised of

9   "affectionate tickling," of their genitals and Erin also recalls a high-pitched sing-songy, baby-

10   like words accompanying the abuse. The abuse was framed to Erin as lighthearted,

11   affectionate, silly, normal, and even loving.  Erin's abuse and lack of personal autonomy

12   became a normalized part of Erin's life and how the family functioned. Erin quickly

13   understood they could not deny Eric any "fatherly" affection of any kind.

14       129.   After Erin reached a certain age, Eric stopped overtly sexually abusing Erin, but

15   he did not stop physically abusing Erin. For example, as Erin grew older, the nature of his

16   abuse shifted. Eric no longer fondled Erin's genitals, but he continued to touch Erin's body in

17   ways Erin did not like and even protested against. Every time he walked past Erin, he touched

18   or squeezed Erin, often on the shoulders. Erin would flinch away, ask him to stop, or even yell

19   at him, however, he responded in a manipulative manner that sought to make Erin feel guilty

20   for the abuse.

21       130.   Eric's "forcible hugs" made Erin experience familiar and triggering thoughts and

22   emotions, to wit, Erin was victimizing Eric by withholding affection he was owed.

23       131.   Eric's abuse did not stop with Erin, as there are reports of Eric sexually abusing

24   other children from Kids Kingdom. Erin's younger sister also received the same forced

25   "affection," as it was a normalized part of their family dynamic.

26       132.   Erin was between the ages of 8 and 10 at the time when Erin, Erin's sister and

27   Eric were standing near the front yard of the home of a family that Erin knew well from ICOC.

28   One of the daughters of that family was standing with them and Erin watched Eric reach down

and "tickle" the little girl's genitals in an all too similar fashion. Erin immediately pleaded with him and said, "Dad, you can't do that. She's not 'our' family." Erin had become so brainwashed that Erin genuinely believed genital "tickling" was acceptable within the family.

133.   Around the age of 17, Erin's mother told Erin that their dad had repeatedly cheated on Erin's mother, and said that Eric confessed to being a sex addict. Erin's mother eventually divorced Eric in 2017, long after the permanent damage to Erin had been done.

134.   Erin, like many children who suffered at Defendants' hands, was abused with the ICOC inspired wooden paddle with a heart shaped hole. The paddle was hung on the wall of the family kitchen as a constant reminder of the consequences of Erin's defiance.

135.   When Erin's father disciplined them, he would often start by saying Erin was being spanked because he loved Erin. Eric would then lay Erin across his lap and passionately beat Erin's bottom with the paddle. Sometimes he would use his belt when the beatings were impulsive and spurred by Eric's rage. As a result, Erin lived in constant fear of being physically abused with the paddle or a belt if they defied Eric.

136.   The beginning of Erin's teen years were extremely unstable and traumatic. Between the ages of 14 and 15, Erin left ICOC, dropped out of high school and attempted suicide twice. These two years would have been an opportune time for Erin to seek therapy or counseling or to find someone to talk to. Instead, Erin was prescribed psychiatric medications that worsened Erin's symptoms and contributed to their further social isolation. Erin suspects this is due to their father not wanting Erin to disclose the abuse to a therapist.

137.   Although Erin has been forced to live with a lifetime of trauma and devastation resulting from the systematic abuse Erin suffered at Eric's hands, Eric has been free to continue his life as a sexual predator and psychologist without consequence. Alarmingly, before retiring Eric continued working with children and earned five certificates in child and adolescent functioning, assessment, and training. On information and belief, Eric is currently residing in the Gainesville, Florida area and was previously working as a coach with the "Research Lead" at the Institute for Conflict. Over the years, rumors have circulated that Eric abused children while he worked at Mercy Home for Boys and Girls.

138.   Eric's coaching/therapy services included using the "Jungian Advanced Motor Processing" therapy method, which is purportedly "known to be highly effective in reducing the following negative effects of dis-regulated emotional states and psychological disorders: Anger, Sadness, Numbness, Confusion, Worry, Fear, Hurt, Negative Beliefs, Disbelief, Rage, Anxiety, Minimization, Denial, Pain, Revulsion, Guilt, Shame, Betrayal, Withdrawal, Embarrassment, Jealousy, Despair, Self-Blame, Doubt, Revenge, Dissociation, Shame, Trauma, Complex Trauma, PTSD, Anxiety, Body Image, Stress, Negative Thinking Patterns, Negative Self Talk, Self-Hate, Panic attacks, Panic Disorder, Sexual Trauma, Physical Trauma, Childhood Abuse, Childhood Sexual Abuse, Phobias, Body Dysmorphic Disorder, Eating Disorders, Disturbing Thoughts & Memories, Flashbacks, Dissociative Disorders, Psychosomatic Disorders, Transitioning off of Psychotropic Medications, Sleep Disturbances, Self-Esteem and Self Defeating Behaviors."

139.   Ironically, Eric provided coaching and therapy services to individuals who suffer from the same mental illness symptoms, including childhood sexual abuse and sexual trauma, among many others, that he created for Erin by sexually and emotionally abusing Erin for multiple decades.

140.   Erin has been unable to sustain healthy social relationships, cycling through the abusive and exploitative relationships their father groomed them for. Erin's mental health struggles prevent them from working more than a handful of hours a week.

141.   Erin has been diagnosed with Post-Traumatic Stress Disorder (PTSD) and Developmental Trauma. Together, these two are known colloquially as cPTSD (the "c" stands for "complex"). Erin has also been diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder. In addition to these medical conditions, Erin also has MCAS (Mast Cell Activation Syndrome), which is similar to an autoimmune disorder, but correlated to trauma.

142.   Erin is also on several psychiatric medications and is in therapy doing intense trauma work. Erin was also diagnosed with "high tone pelvic floor," which is a pelvic floor dysfunction where the pelvic muscles are chronically tight and cause a number of secondary

issues. Erin has a profoundly deep feeling of shame, the hallmark of sexual abuse, associated with feelings that Erin can only describe as, "It's my fault."

143.    As a direct and proximate result of Erin's abuse at the hands of Eric, ICOC, and its leadership, Erin suffered and continues to suffer a litany of injuries. Among other injuries, Erin has experienced and will continue to experience for the rest of Erin's life include severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

## FIRST CLAIM FOR RELIEF

## SEXUAL ASSAULT OF A MINOR

### *(Against All Defendants and Does 1-10)*

144.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

145.    Defendants intentionally, willfully, and maliciously sexually assaulted and/or sexually abused and molested Plaintiff during the time that Plaintiff was a minor.

146.    In committing the unlawful acts of sexual assault against Plaintiff, Defendants intended to put Plaintiff in imminent apprehension of harmful or offensive contact.

147.    Defendants put Plaintiffs in imminent apprehension of such harmful offensive contact as Plaintiffs actually believed the  Defendants had the ability to make harmful or offensive contact with plaintiff's person.

148.    Plaintiffs did not consent to Defendants' intended harmful or offensive contact with plaintiff, Defendants' intention to put Plaintiffs in fear of imminent apprehension of such contact, plaintiff was a minor during the time herein alleged and, therefore, lacked the ability to consent to sexual contact with any person, including Defendants.

149.     As a direct and legal result of this conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional

limits of this Court.

150.   Defendants conduct described herein was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish, and emotional and physical distress.

151.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages in an amount to be determined by the Court.

**SECOND CAUSE OF ACTION**

**VIOLATION OF PENAL CODE 647.6(a)(1)**

*(Against All Defendants and Does 1-10)*

152.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

153.   California Penal Code § 647.6(a)(1) provides that "[every person who aims or molests any child under 18 years of age shall be punished by a fine not exceeding five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."

154.   As alleged herein, Defendants engaged in sexual penetration with Plaintiffs while Plaintiffs were under eighteen years of age, in violation of California Penal Code § 647.6(a)(1).

155.   Under California law, victims of childhood sexual abuse are entitled to bring civil actions for violations of Penal Code provisions that prohibit adults from engaging in sexual acts with minors, including Penal Code § 647.6(a)(1). See Angie M. v. Superior Court, (1995) 37 6 Cal.App.4th 1217, 1224-1225.

156.   Defendants above-noted actions in annoying and molesting the minor Plaintiffs was the proximate and legal causes of physical, psychological, emotional, and economic damages Plaintiffs have suffered and continues to suffer to this day. It also has resulted in Plaintiffs incurring, and will require Plaintiffs to incur into the future, expenses for medical

and psychological treatment, therapy, and counseling.

157.   The above-described conduct of Defendants was oppressive, malicious   and despicable in that it was intentional and done in conscious disregard for the rights and safety of Plaintiffs, and was carried out with a conscious disregard of Plaintiffs right to be free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to California Civil Code section 3294, entitling Plaintiffs to punitive damages against the   Defendants   in an amount appropriate to punish and set an example of them.

**THIRD CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*(Against All Defendants and Does 1-10)*

158.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

159.   The conduct of all Defendants as set forth in this Complaint was extreme and outrageous, and committed with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

160.   A reasonable person would not expect or tolerate the sexual assault committed by Defendants.

161.   A reasonable person would not expect, accept or tolerate Defendants' unlawful sexual assault and/or sexual abuse, and molestation of Plaintiffs.

162.   Defendants' conduct exceeded all bounds of that usually tolerated in a civilized community.

163.   Defendants intended to cause Plaintiffs injury when they sexually assaulted Plaintiffs, manipulated and brainwashed Plaintiffs into silence and actively concealed Plaintiffs' abuse.

164.   Plaintiffs have suffered severe and/or extreme distress as a result.

165.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment,

and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

166.   Defendants' conduct described herein was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish and emotional and physical distress.

167.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are, therefore, entitled to the recovery of punitive damages, in an amount to be determined by the Court.

## FOURTH CAUSE OF ACTION

### NEGLIGENT HIRING, SUPERVISION, AND RETENTION

*(Against All Defendants and Does 1-10)*

168.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

169.   At all times relevant, a special relationship existed between  Defendants and Defendants, because Defendants were the agents of Defendants, each of whom had the ability to control of Defendants' conduct, yet failed to exert it. In doing so, Defendants created a widespread culture of acceptance of the abuse of children, as Defendants and Defendants collectively brainwashed and manipulated Plaintiffs to remain silent about the abuse and these Defendants also actively concealed the abuse to avert discovery by the authorities.

170.   At all times herein. Defendants, and each of them, negligently supervised, managed, and controlled Defendants in their membership and participation in  Defendants' Church, and negligently failed to warn Plaintiffs, Plaintiffs' parents, and other members of the Church, of the propensity and risk that Defendants would sexually assault, sexually abuse, and/or molest minor children, a propensity and history of which Defendants, and each of them, acting through their employees, agents, and volunteers, had actual notice. During the same time period, Defendants, and each of them, were negligent in failing to

exercise reasonable care to protect Plaintiffs, and other minors, who were members of, or participants in, activities at Defendants' Church, from the risk of sexual assault, sexual abuse and molestation by perpetrators, including the Defendants.

171. Defendants were further negligent in failing to notify law enforcement and other appropriate authority that Plaintiffs were and/or continued to be a victim of child abuse/assault by the Defendants when they learned of this fact. Defendants' failure to report the known and/or reasonably suspected child abuse of Plaintiffs, but instead Defendants perpetuated and facilitated Defendants' continued sexual abuse and/or sexual assault, and molestation of Plaintiffs.

172. If Defendants satisfied their duty to take reasonable steps to protect Plaintiffs all minor children, from known and/or foreseeable harm, including sexual assault, including reporting the sexual assault and/or sexual abuse, and molestation to law enforcement, then some or all of the Plaintiff's injuries would have been avoided.

173. Prior to, during, and after the sexual assault of Plaintiffs, Defendants, through their administrators, employees, agents, and/or volunteers, had knowledge, and/or were otherwise on notice, that Defendants had and/or was engaged in, and/or presented the risk of, sexual assault of Plaintiffs, and other minors.

174. Plaintiffs are informed, believes, and thereupon alleges that prior to, and during the Defendants' sexual assault and/or sexual abuse, and molestation of Plaintiffs, Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of Defendants' unlawful conduct, as set forth in this Complaint, but failed and/or refused to take any affirmative action, including but not limited to notifying law enforcement. Instead, Defendants directed Plaintiffs and Plaintiffs' parents to continue to have contact with Defendants thereby ratifying and facilitating Defendants' continued sexual assault and/or sexual abuse and molestation of Plaintiffs.

175. Defendants breached their duties by failing to use reasonable care to protect Plaintiffs from their pastor, deacon, employee, and/or agent, to wit, Defendants.

176. If Defendants fulfilled their duty and responsibility, then Plaintiffs would not

have been subject to all or most of the misconduct perpetrated against her and the resulting harm.

177.   As a direct and legal result of Defendants' conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

178.   Plaintiffs are informed, believes, and thereupon alleges that Defendants' failure to respond, investigate, terminate Defendants' employment, report, or take any other action following Plaintiffs, other minor children, and Plaintiffs parents' report of sexual assault and/or abuse by Defendants was part of Defendants' concerted effort to cover up and/or hide evidence related to childhood sexual assault of minor children, including Plaintiffs.

179.   Plaintiffs' damages as a result of Defendants' repeated sexual assault, abuse, and molestation of Plaintiffs was a direct result of Defendants' concealment and cover-up. As such. Plaintiffs are entitled to treble damages against Defendants pursuant to Code of Civil Procedure section 340.1(b)(2).

## FIFTH CAUSE OF ACTION

## NEGLIGENT SUPERVISION OF A MINOR

*(Against All Defendants and Does 1-10)*

180.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

181.    Defendants and McKean and Lucas (McKean and Lucas are collectively, the "Church Leader Defendants"), and each of them, were responsible for the care, custody, control, supervision, and protection of the minor children entrusted to them, including Plaintiffs.  Defendants and Church Leader Defendants had a duty to adequately and properly supervise, monitor, and protect Plaintiffs from known and knowable dangers, such as those posed by the Defendants.

182.    Defendants and Church Leader Defendants, and each of them, breached their duty to properly and adequately supervise, monitor, and protect Plaintiffs, in part because officers, administrators, agents, and other supervisory employees knew or should have known of the  Defendants' improper behavior, including that minor children, including Plaintiffs, were frequently alone with Defendants without any justification, that Defendants would frequently touch and sexually abuse minor children, including Plaintiffs, at Church Leader Defendants and  Defendants' Churches without any justifiable reason for doing so, including when the minor children were by themselves, and Defendants sexually abused, assaulted, and/or molested minor children, including but not limited to Plaintiffs.

183.    Defendants and Church Leader Defendants, acting through their administrative and supervisory employees, knew or should have known that Plaintiffs were unattended and unsupervised with Defendants on numerous occasions, without any justification.

It should have been obvious to any officer, agent, administrator, employee, or staff member that there was no reason that neither Plaintiffs, nor any other child, should have been alone with Defendants. The employees and agents of Defendants and Church Leader Defendants instead turned a blind eye to the fact that Defendants were spending time with minor children, including Plaintiffs, unattended and unsupervised without any investigation into the matter.

184.    After engaging in grooming activity of Plaintiffs while spending time alone with Plaintiffs, Defendants started sexually assaulting, sexually abusing, and molesting Plaintiffs and other minor children on Defendants' premises and during Defendants and Church Leader Defendants' church related services. The acts of sexual assaults and abuse occurred while Plaintiffs were left unattended and unsupervised with Plaintiffs.

185.    If  Defendants and Church Leader Defendants, and each of them, adequately and properly supervised, monitored, and protected Plaintiffs, Plaintiffs would not have been harmed, or would not have been harmed to the extent that Plaintiffs were.

186.    Defendants and Church Leader Defendants, and each of them, also recklessly and negligently failed to implement and/or enforce policies and procedures that were aimed at preventing or detecting sexual assault and assault of their minor members.

187.   If Defendants and Church Leader Defendants, and each of them, adequately performed their duties and responsibilities, then Plaintiffs would not have been subject to the sexual assault, assault and harassment perpetrated by the Defendants.

188.   Plaintiffs have been severely damaged emotionally and physically, and otherwise, in amounts to be proven at the time of trial, but which exceed the jurisdictional limits of the Superior Court as a direct and legal result of the acts and omissions of Defendants and Church Leader Defendants, and each of them.

## SIXTH CAUSE OF ACTION

**FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP. BASED ON VICARIOUS LIABILITY**

*(Against All Defendants and Does 1-10)*

189.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

190.   Defendants and Church Leader Defendants, through their administrators and employees knew or reasonably suspected that the Defendants had, and or was, engaged in the sexual assault of children while the children were under the care, custody, and supervision of Defendants, and each of them, and thus had a duty to report Defendants to the appropriate authorities under the California Child Abuse and Neglect Reporting Law. (Penal Code §§ 11164-11174.3, "CANRA".)

191.   At all times relevant herein and material hereto, Defendants were employees of Defendants and Church Leader Defendants. Defendants and Church Leader Defendants were responsible for hiring, training, supervising, and retaining Defendants as part of their church and youth bible studies program. Defendants and Church Leader Defendants' staff, employees, and administrators were required to report any suspected child or sexual abuse as part of their duties and responsibilities as employees and/or agents of Defendants and Church Leader Defendants.

192.   Defendants' and Church Leader Defendants' administrators, board members,

and employees are mandated reporters under Penal Code section 11165.7.

193.   Penal Code section 11166(a) states that a mandated reporter shall make a report to an agency whenever he/she, in his/her professional capacity or within the scope of his/her employment, has knowledge of or observes a child whom the mandated reporter knows, or reasonably suspects has been a victim of child abuse or neglect. "Reasonable suspicion" does not require certainty that child abuse or neglect has occurred but looks to if it is objectively reasonable for a person to entertain a suspicion to suspect child abuse or neglect. (Penal Code § 11 lr66(a)(l).)

194.   As set forth in this Complaint, Defendants and Church Leader Defendants, through their administrators, board members, and employees knew and/or reasonably suspected that children had been sexually assaulted by Defendants, prior to the Defendants' sexual assault of Plaintiffs, giving rise to a duty to report such conduct under CANRA.

195.   Defendants and Church Leader Defendants, through their administrators, board members, and employees knew that in the absence of the exercise of reasonable diligence, that an undue risk to minors, including the Plaintiffs, existed because Defendants' administrators, board members, and/or employees did not comply with California's mandatory reporting requirements.

196.   Defendants, through their administrators, board members, and employees, including but not limited to and Church Leader Defendants, failed to report the known and/or reasonably suspected child molestations and assaults, created the risk and danger contemplated by CANRA, and a result, unreasonably and wrongfully exposed Plaintiffs and other minors to sexual molestation and abuse,

197.   If Defendants, through their administrators, board members, and employees, including but not limited to the Church Leader Defendants, complied with CANRA's mandatory reporting requirements, then Plaintiffs would not have been harmed at all or to the extent that she was.

198.   As a direct result of Defendants and Church Leader Defendants' failure to comply with CANRA's mandatory reporting requirements, through their administrators,

board members, and employees. Defendants and Church Leader Defendants wrongfully denied the Plaintiffs the intervention of child protection services and constituted a per se breach of Defendants, through their administrators, board members, and employees, duties to Plaintiffs.

199.   As a direct and legal result of Defendants and Church Leader Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## SEVENTH CAUSE OF ACTION

### NEGLIGENCE

*(Against All Defendants and Does 1-10)*

200.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

201.    Defendants owed a duty of care to the minor Plaintiffs or had a duty to control the conduct of the  Defendants by way of the special relationship existing between those individuals and Plaintiffs.

202.   Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of the misconduct and sexually predatory behavior of the  Defendants directed towards minor children, including Plaintiffs.

203.   Despite having knowledge of the misconduct of the  Defendants, all Defendants herein failed to take any preventative action to control, curb, and/or prevent that conduct, failed to warn Plaintiffs or Plaintiffs' parents of that wrongful conduct, and/or failed to notify law enforcement, despite having a legal duty to do so.

204.   As a direct and legal result of Defendants' negligence, Plaintiffs were sexually assaulted, sexually abused, sexually harassed, and assaulted by the  Defendants.

205.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against Plaintiffs and the

resulting harm.

206.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and-future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## EIGHTH CLAIM FOR RELIEF

**Violation of Federal Racketeer Influenced and Corrupt Organization ("RICO") Act**

**18 U.S.C. § 1962(c)**

*(Against All Defendants and Does 1-10)*

207.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

208.   Plaintiffs bring this claim for relief under the private cause of action provided by 18 U.S.C. § 1984(c), which prohibits violations of the Federal RICO Act insofar as such violation injures any person in his business or property.

209.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

210.   The Abuse Enterprise, distinct from Defendants, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), organized within individual ministries, funneling into regions governed by individual bishops, and headquartered in Los Angeles, California. Members of the Abuse Enterprise maintain a common purpose of extracting money from its members and perpetrating sexual abuse upon minor children under the auspices of liturgical praxis and writings taught by its church ministers worldwide. The Abuse Enterprise began as early as 1979 and continues with a growing global membership of more than 120,000 today.

211.   Defendants have conducted and participated in the affairs of the Abuse Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

212.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260.

213.   Each Defendant, in their individual capacity, knew or should have known about the majority of the predicate acts carried out by Defendants within the Abuse Enterprise.

214.   Upon information and belief, some combination of Defendants have engaged in an uninterrupted course of unlawful conduct consisting of all of the herein described predicate acts.

215.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts:  (i) violating the prohibition against human trafficking under 18 U.S.C. § 1590; (ii) laundering of monetary instruments outside of the United States with the intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §1956(a)(2); and (iii) sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260 Upon information and belief, several hundred children have been sexually exploited as a result of this pattern of racketeering behavior.

216.   Upon information and belief, hundreds of individuals within Defendants' inner circles have been extorted through fear of financial and physical injury into making large financial payments to Defendants and into providing sexual services to Defendants as a result of this pattern of racketeering behavior.

217.   Upon information and belief, many millions of dollars have been trafficked out of the United States for the purposes of carrying on unlawful activity as a result of this pattern of racketeering behavior.

218.   Upon information and belief, Defendants' pattern of racketeering behavior has been related and continuous since its inception.  Upon information and belief, there is not only a threat of continued criminal activity, but continued criminal activity is occurring within the Abuse Enterprise at the hands of nearly all Defendants as of the writing of this Complaint.

219.    Defendants and the Abuse Enterprise regularly move goods, money, and people across state lines, and are therefore engaged in interstate commerce.

220.    As a direct and proximate result of these patterns of racketeering behaviors, Plaintiffs have sustained damages, including lost wages, loss of economic opportunity, loss of educational opportunity, loss of future income, loss of specific extorted payments, physical injury, severe emotional distress, and additional economic losses.

221.    Plaintiffs are therefore entitled to recover treble the damages she sustained in an amount to be proven at trial, the cost of the suit, plus a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

## NINETH CLAIM FOR RELIEF

### Sexual Battery in Violation of Cal. Civ. Code § 1708.5

*(Against All Defendants and Does 1-10)*

222.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

223.    Plaintiffs bring this claim for relief under Cal. Civ. Code Section 1708.5, which prohibits sexual battery.

224.    Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

225.    As alleged herein, Plaintiffs the victim of sexual battery as a minor perpetrated by the  Defendants. Defendants subjected Plaintiffs to this sexual battery at the hands of while Plaintiffs were minors.

226.    Cal. Civ. Code § 1708.5 prohibits any act with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with the person results, or any act that causes an imminent apprehension of such harmful or offensive contact and the offensive contact results.

227.   Defendants knowingly conspired and/or aided and abetted to force Plaintiffs into sexual battery with Defendants, and such sexual battery did, on multiple occasions, occur.

228.   Plaintiffs were minors minor when Defendants sexually battered them.

229.   Each Defendant knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with the  Defendants, all in furtherance of sexually battering Plaintiffs and in furtherance of the Abuse Enterprise.

230.   The sexual battery of Plaintiffs by the Abuse Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

231.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

232.   The aforementioned conduct was willful, wanton, and malicious.   At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

233.   Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees, and other relief that the Court may deem proper.

## TENTH CLAIM FOR RELIEF

### Gender Violence in Violation of Cal. Civ. Code § 52.4

*(Against  Defendants and Does 1-10)*

234.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

235.    Plaintiffs bring this claim for relief under Cal. Civ. Code Section 52.4, which prohibits acts of gender violence.

236.   Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending

Sections 340.1 and 1002 of the California Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

237. As alleged herein, Plaintiffs were the victims of multiple instances of sexual battery as a minor perpetrated by the  Defendants and facilitated by all Defendants herein. Defendants subjected Plaintiffs to these multiple incidents of sexual battery at the hands of the  Defendants while Plaintiffs were minors.

238. Cal. Civ. Code § 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

239. As alleged herein, Plaintiffs were repeatedly the victim of acts of gender violence by the  Defendants while they were minors.

240. Each Defendant herein knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Defendants, all in furtherance of committing acts of gender violence against Plaintiffs.

241. The repeated sexual battery of Plaintiffs by Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

242. As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

243. The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care. Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

244.    Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees and other relief that the Court may deem proper.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully pray for relief as follows:

(a)    Compensatory and special damages in an amount to be proven at trial;

(b)    Statutory penalties and liquidated damages according to proof at time of trial;

(c)    Punitive and exemplary damages in an amount according to proof at the time of trial;

(d)    Treble damages;

(e)    Pre- and post- judgment interest;

(f)    Reasonable attorney's fees and costs; and

(g)    Such other and further relief as the Court deems just and proper.

Plaintiffs respectfully demand a trial by jury on all claims so triable.

**SAMINI BARIC KATZ LLP**

Date: June 16, 2023        By:    /s/ Bobby Samini

Bobby Samini, Esq.
Michael Katz , Esq.
Steve Baric, Esq.
Nicole C. Prado, Esq.
John S. Oney, IV, Esq.
*Attorneys for Plaintiffs*
*Anthony M. Stowers and Erin Tomlinson*

1

<u>**PROOF OF SERVICE**</u>

2

STATE OF CALIFORNIA)

3

COUNTY OF ORANGE)

4

     I am employed in Orange County.  My business address is 650 Town Center Drive, Suite 1500, Costa Mesa, CA 92626, where this mailing occurred.  I am over the age of 18 years and am not a party to this cause.  I am readily familiar with the practices of SAMINI BARIC KATZ LLP for collection and processing of correspondence for mailing with the United States Postal Service.

5

6

7

     On June 16, 2023, I served the foregoing documents on the interested parties in this action entitled as follows:

8

**SECOND AMENDED COMPLAINT**

9

<u>**SEE ATTACHED SERVICE LIST**</u>

10

[]     (**BY MAIL**) I placed such envelope for collection and mailing on this date following ordinary business practices.

11

12

[ ]     (**BY PERSONAL SERVICE**) I caused to be hand delivered such envelope to the addressee so indicated.

13

**[XX] (BY THE COURT'S ECF SYSTEM)**:  I caused each such document(s) to be transmitted electronically by posting such document electronically to the ECF website of the United States District Court for the Central District of California, on all ECF-registered parties in the action.

14

15

16

[]     (**BY EMAIL**) On June 16, 2023, I caused the above-referenced document(s) to be sent in electronic PDF format as an attachment to an email addressed to the person(s) on whom such document(s) is/are to be served at the email address(es) shown above, as last given by that person(s) or as obtained from an internet website(s) relating to such person(s), and I did no receive an email response upon sending such email indicating that such email was not delivered.

17

18

19

[XX] (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this court at whose direction the services was made.

20

21

     Executed on June 16, 2023, at Costa Mesa, California.

22

                  */s/ Griselda Alfaro*_____

23

24

25

26

27

28

1

2

**SERVICE LIST**

***Anthony M. Stowers et al. v. International Churches of Christ, Inc., et al.***
***USDC – Central District, Case No. 2:22-cv-09467-ODW-PLA***

3

| | |
|---|---|
| Andrew J. Waxler, Esq.<br>John T. Lupton, Esq.<br>Madeleina Halley, Esq.<br>Tad A. Devlin<br>KAUFMAN DOLOWICH &<br>VOLUCK, LLP<br>21515 Hawthorne Blvd., Suite 450<br>Torrance, CA 90503<br>Telephone: 310-525-9720<br>Fac: 805-388-3414<br>awaxler@kdvlaw.com<br>jlupton@kdvlaw.com<br>mhalley@kdvlaw.com<br>tdevlin@kdv.com | *Attorneys for Defendant, HOPE*<br>*WORLDWIDE, LTD.* |
| Eugene E. Egan<br>James A. Harris<br>MANNING AND KASS ELLROD<br>RAMIREZ TRESTER LLP<br>801 South Figueroa Street, 15th Floor<br>Los Angeles, CA 90017<br>Telephone: @13-624-6900<br>Fax: 213-624-6999<br>eje@manningllp.com<br>jimmy.harris@manningkass.com | *Attorneys for Defendant, THE*<br>*CHICAGO CHURCH OF CHRIST,*<br>*CORNERSTONE CHURCH OF*<br>*CHRIST* |
| Bryan Christopher Swaim<br>BORDIN SEMMER LLP<br>6100 Center Drive Suite 1100<br>Los Angeles, CA 90045<br>323-457-2110<br>Fax: 323-457-2120<br>Email: bswaim@bordinsemmer.com | Attorneys for Defendant, *Crossway*<br>*Church* |
| Mindee J Stekkinger<br>BEACH LAW GROUP LLP<br>500 East Esplanade Drive, Suite 1400<br>Oxnard, CA 93036<br>Telephone: 805-388-3100 | *Attorneys for Defendants, CITY OF*<br>*ANGELS INTERNATIONAL*<br>*CHRISTIAN CHURCH, THE*<br>*INTERNATIONAL CHRISTIAN*<br>*CHURCH, INC., and* |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

| Fax: 805-388-3414<br>Email: mail@beachlawgroup.com | *MERCYWORLDWIDE* |
|---|---|

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28